BYRON F. BABBITT, Trustee in Bankruptcy of the RANDOLPH-MACON COAL COMPANY, Appellant, v. CHICAGO & ALTON RAILWAY COMPANY, Respondent.

Springfield Court of Appeals, July 7, 1910.

1. DEMAND: Definition: Interest. A "demand" in the sense that it is used in section 3705, Revised Statutes 1899, providing for the allowance of interest on accounts, has been defined as "a requisition or request to do a particular thing specified under a claim of right on the part of the person requesting."

2. ———: Evidence: Circumstantial Evidence. The proof of a demand may be by circumstantial evidence, or may be inferred from the actions and declarations of the parties as proven by direct evidence.

3. ————: Interest: Sufficiency of Evidence. In a suit by a trustee in bankruptcy against a railroad company on an account for coal sold by the bankrupt company to the railroad company, the court in rendering judgment, allowed interest on the account from the date the suit was filed. The plaintiff contended that his appointment as trustee was sufficient to start the running of interest, and that the stipulation in evidence that the railroad company stood ready and willing to pay the claim, less their set-offs, was sufficient to show demand had been made. The evidence is examined and *held* not to show a legal demand prior to instituting the suit, and that it was proper to allow interest only from the date the suit was commenced.

4. INTEREST: Demand: Burden of Proof. Where a creditor claimed that interest should be allowed on an account from a date prior to the filing of a suit, the burden of proof is upon him to show such right by reason of having made a demand before the suit was instituted.

5. CORPORATIONS: Sale of Assets: Purchasing Company's Assumption of Obligations of Selling Company. Where one coal company purchases all the property of another coal company, except the books, papers, accounts, etc., of the latter company, the selling contract is examined, together with the other evidence, and it is *held* that the purchasing company did not assume the obligation of the selling company, which arose out of a contract between the latter company and a railroad company, whereby the selling company had agreed, in consideration of the construction by the railroad company of a switch track, to ship over the railroad company's line a certain number of cars of coal within a certain time, and upon failure to ship said cars, it was to pay the railroad company the cost of the switch track, less the credits of so much per car for the cars actually shipped over said line within the prescribed period.

6. ————: ————: ————. A coal company made a contract with a railroad company for the construction of a switch, whereby the coal company became obligated to pay the cost of construction of said track in the event that they failed to ship a specified number of cars of coal over the railroad company's line. The contract further specified that "This Agreement shall extend to and be binding upon the lessees, purchasers, successors and assigns of the parties hereto." *Held*, that the coal company was not relieved from this obligation upon selling its assets to another company, nor did the purchasing company assume the payment of this obligation by the mere purchase of the assets of the coal company.

7. **CONTRACTS: Novation: Debtor and Creditor.** To constitute a novation by the substitution of a new debtor, there must be a mutual agreement between three parties—the creditor, his immediate debtor, and the intended new debtor—whereby the liability of the last named is accepted in place of that of the original debtor in discharge of the original debt.

8. ———: ———: **Burden of Proof.** A contract of novation must be proven; it is never to be presumed and the burden of proof rests on him, who asserts there has been a novation, to establish it by evidence of the discharge of the original debt, and of an express agreement or acts of the parties clearly showing the intention to work a novation.

9. ———: **Meeting of Minds: Entries on Books.** It is essential to the making of a contract that there be a meeting of the minds, and no one can enter into an agreement with another party by merely making an entry on his books, of which the other party has no notice or knowledge.

Appeal from St. Louis City Circuit Court.—*Hon. Robert M. Foster,* Judge.

REVERSED AND REMANDED (*with directions*).

*Bryan & Christie* and *Alroy S. Phillips* for appellant.

(1) Where it appears in an action upon an account that defendant has at all times offered to pay the amount claimed less certain set-offs, interest should be allowed plaintiff on the balance found to be due from the date demand of payment is made. R. S. 1899, sec. 3705, 4493; 22 Cyc. 1514, 34 Cyc. 758; Healy v. Fallon, 69 Conn. 235; Railroad v. Iron Works, 117 Mo. App. 167; Attrill v. Patterson, 58 Md. 245. (2) In order that a third person may be substituted in the place of a debtor under a contract, the creditor and the debtor and the third person must all agree concurrently that the debtor be released and the third person be substituted in his stead, and unless these facts be shown to exist, the creditor is not entitled to offset his debt in an action by the third person. The mere transfer of the debt

on the books of the creditor without the knowledge or consent of the debtor and the third person is insufficient. 29 Cyc. 1130; 21 Am. and Eng. Ency. of Law, 660; 29 Cyc. 1136; 21 Am. and Eng. Ency. of Law, 662; Lee v. Porter, 18 Mo. App. 383; Spaunhorst v. Link, 46 Mo. 199; Hageman v. United Railways, 202 Mo. 249, Griggs v. Day, 136 N. Y., 152; American Co. v. Wyman, 92 Mo. App. 300.

*Robert & Robert* for respondent.

(1)  Interest cannot be allowed on accounts until after demand.  Southgate v. Railroad, 61 Mo. 89; Phillips v. Laclede County, 76 Mo. 68; Compton v. Johnson, 10 Mo. App. 88; Kamerick v. Castleman, 29 Mo. App. 658; Shinn v. Wooderson, 95 Mo. App. 15.  (2)  The contract between the railway company and the Coal Creek Coal & Mercantile Company did assign the contract to the Randolph-Macon Co., and the latter accepted it and adopted it as its own.  Leahy v. Dugdale's Admr., 27 Mo. 437; St. Louis v. Clemens, 42 Mo. 69; Construction Co. v. Prather, 58 Mo. App. 487; Hall v. Chitwood, 106 Mo. App. 568; Gordon v. Jefferson City, 111 Mo. App. 23.

NIXON, P. J.—This is an appeal from the action of the circuit court in overruling appellant's motion to set aside the finding and judgment and grant a new trial in a suit on an account filed by appellant on January 18, 1908, and tried before the court sitting without a jury on the pleadings and an agreed statement of facts, portions of which, material to the present discussion, will be hereinafter set out.

The petition contains an allegation to the effect that the respondent is indebted to the appellant upon an account for coal sold and delivered to the respondent by the Randolph-Macon Coal Company at respondent's special instance and request between January 2, 1907,

and February 23, 1907, amounting to $18,784.75, and that on April 1, 1907, appellant made demand of respondent for the payment thereof. The prayer is for judgment for said amount with interest from the date of the demand.

The answer admitted the allegations of the petition, and was to the effect that on February 20, 1907, the Randolph-Macon Coal Company was duly adjudicated a bankrupt, and that on May 10, 1907, appellant was duly appointed and qualified as trustee in bankruptcy of the estate of the bankrupt, and that respondent had purchased the coal of the Randolph-Macon Coal Company and agreed to pay for the same; "that it had ever been ready and willing to pay for the said coal, less the amount of said set-offs hereinafter mentioned." Further answering, "denies that the plaintiff demanded the payment of the said amount on April 1, 1907, but charges the fact to be that from the date of the appointment of the trustee for the plaintiff, there had been negotiations for settlement between the plaintiff and the defendant, and that the defendant has offered and at all times stood ready and willing to pay said sum of money less the amount of the set-offs and counterclaim hereinafter mentioned." For a first set-off, the answer pleads facts, which, if allowed, would entitle respondent to the sum of $3970.24, under the contract between it and the Coal Creek Coal & Mercantile Company. The second set-off is for $283 due for car service. The third set-off is for $49.50 for coal. The counterclaim is for six dollars for car service since the adjudication in bankruptcy.

In the agreed statement of facts, the parties admit that the sum of $18,784.75 is due appellant for coal upon the account attached to the petition, and that the respondent is entitled to a set-off in the sum of $338.50 under its second and third set-offs and under its counterclaim. "That up to the filing of the suit in this case, the defendant has always stood ready and willing to pay the amount claimed in the petition, to-wit, $18,784.75,

less the four amounts claimed in the three set-offs and counterclaim, amounting to $4308.74."

On May 7, 1904, respondent and the Coal Creek Coal & Mercantile Company entered in the following contract:

"This agreement, made this seventh day of May, A. D. 1904, by and between the Chicago & Alton Railway Company, party of the first part (hereinafter called the Railway Company), and the Coal Creek Coal & Mercantile Company, a corporation of the State of Missouri, party of the second part (hereinafter called the Coal Company).

WITNESSETH:

"That whereas, the party of the second part has applied to the Railway Company for the construction of a railroad switch track from the main tracks of the Railway Company to its coal mine, situated near Yates, in the State of Missouri, and the Railway Company is willing to construct the same, upon the terms and conditions hereinafter set forth:

"Now, therefore, in consideration of the premises and of the covenants and agreements hereinafter set forth to be kept and performed by each of the parties hereto, it is mutually covenanted and agreed by the parties hereto:

"First.    The Railway Company agrees that it will furnish the necessary track material and lay and construct the railroad switch track upon the premises of the Coal Company at the place and in the manner shown and marked in red upon the blue print hereto attached and made a part hereof.

"Second.    The Coal Company agrees that it will do all the necessary grading for said track at its own expense, and furnish the necessary right of way therefor.

"Third.    The ownership of the ties, rails and any other track material used in the construction of said track, shall remain in the Railway Company.

"Fourth. The Coal Company agrees to furnish to the Railway Company a surety company's bond, satisfactory to the Railway Company, in the penal sum of $10,000 conditioned that the Coal Company will during the period of three years, commencing on the date the first car load (of 30,000 pounds) of mercantile coal is shipped from its said mine, load and ship over the lines of the Railway Company not less than 3300 cars of mercantile coal, it being understood and agreed that the cost of said track is approximately $6600; that the same will be charged to the Coal Company on the books of the Railway Company, and a credit will be allowed by the Railway Company upon the amount so charged of two dollars per car upon each car of mercantile coal shipped by the Coal Company over the lines of the Railway Company to stations other than Yates, Missouri.

"In the event that said Coal Company shall fail to ship the 3300 cars of mercantile coal over the lines of the Railway Company during said period of three years, the Coal Company covenants and agrees that it will pay the Railway Company the entire cost of said side track, less the amount credited against such cost at the rate of two dollars per car for each car of mercantile coal shipped over the lines of the Railway Company, if there be any such credit.

"It is mutually understood and agreed by and between the parties hereto that in the event the Coal Company fails to open its said mine and commence the regular shipment of at least one hundred tons of mercantile coal per day on or before June 1, 1905, this contract shall thereupon cease and determine, and the Coal Company will thereupon pay to the Railway Company the total cost of said side track.

"The Coal Company agrees that it will notify the Railway Company promptly at the date of the shipment of the first car of mercantile coal under this contract.

"Fifth. On or after three years from the date of the shipment of the first car of mercantile coal over

said tracks, the Railway Company may take up and remove the rails, ties and track material upon giving the Coal Company thirty days' notice of its intention to so remove the same.

"Sixth. The Railway Company agrees to keep and maintain said side track in good condition and repair during the life of this contract.

"Seventh. The Coal Company covenants and agrees to indemnify and save harmless the Railway Company from any and all damage and expense whatsoever in any manner growing out of the construction, maintenance and operation of said tracks.

"This agreement shall extend to and be binding upon the lessees, purchasers, successors and assigns of the parties hereto."

On February 16, 1905, the Randolph-Macon Coal Company purchased all the property and assets of the Coal Creek Coal & Mercantile Company except the latter's money, accounts, books of account, books of record and other corporate documents and papers, the conveyance being made by a deed, the material portions of which read as follows:

"The party of the first part does hereby grant, bargain and sell, convey and confirm unto the said party of the second part, and to its successors and assigns, all of the real property and mines, all the landed interests and all the personal property attached to or used in or about the mines, and all of the merchandise and other personal property, including live stock (but excepting money, accounts due and to become due, books of account, books of record and other corporate documents and papers) owned by said party of the first part wherever situated."

The deed then proceeds to particularly describe all of the lands and coal rights of the Coal Creek Coal & Mercantile Company, and concludes as follows:

"It being the intention, however, of this instrument to convey to the said party of the second part and to

its successors and assigns all the right, title and interest of the said party of the first part of whatever nature such interest be in, of or to any real estate belonging to it, whether the same be above specifically mentioned and properly described or not, together with all and every the tenements, hereditaments, fixtures, rights, easements, licenses and privileges thereto belonging or in any wise appertaining, as well as every other authority to enter upon, use and enjoy any lands to the full extent that said party of the first part has hitherto used, owned, employed or enjoyed the same, or which it has hitherto claimed or now claims the right to convey, own, use, employ or enjoy. All of the personal property belonging to, attached to, provided for or used in or about the mines heretofore operated by said party of the first part or to any store heretofore conducted and carried on by it in connection with its mining business, shall also pass by this conveyance the same as if all such personal property and all of the chattels attached to or used in or about said mines or contained in the said stores (except, however, as above, all money, accounts due or to accrue, books of record and of account, papers and documents of the said party of the first part)."

On December 12, 1905, W. E. Murlin, general manager and officer in charge of the Randolph-Macon Coal Company, sent from Moberly, Missouri, to S. M. Felton, president of the respondent company, Chicago, Illinois, a letter reading as follows:

"I understand that the Coal Creek Coal & Mercantile Company, whom this company purchased last March, and with whom you had arrangements for refunding two dollars per car, on total number of cars shipped from this mine within three years from date of shipment of first car, have been making bills against your company for this refund.

"Of course, we do not know whether they have been paid or not, but this refund belongs to this company since the purchase of that company the first of March,

and as soon as possible, we will forward your claim department itemized statement showing total number of cars shipped."

The original and reasonable cost of erecting and building the switch track was $5416.24. This was the amount charged to the account of the Coal Creek Coal & Mercantile Company by respondent on March 30, 1906. The first car of coal shipped by the Coal Creek Coal & Mercantile Company under the contract of May 7, 1904, was in August, 1904, and between that date and January 1, 1906, it shipped 425 cars, for which respondent, on March 30, 1906, gave it a credit of $850 on its books under the contract. During January, February and March, 1906, the Randolph-Macon Coal Company shipped 298 cars of coal over respondent's lines for which respondent, on March 1, 1907, gave it a credit of $596 on its books, charging the Randolph-Macon Coal Company with $6600, as the original cost of the switch under the contract and giving it credit at the rate of two dollars per car for the 425 cars shipped by the Coal Creek Coal & Mercantile Company.

On October 8, 1908, on trial, the court found in favor of the appellant on his cause of action in the sum of $18,784.75, and in favor of respondent on its first set-off in the sum of $3970.24, on its second set-off in the sum of $283, on its third set-off in the sum of $49.50, and on its counterclaim in the sum of $6, leaving a balance in favor of the appellant amounting to $14,476.01, and allowed interest thereon at six per cent from January 18, 1908, making a total amount of $15,105.72, for which sum the court thereupon entered judgment in favor of appellant and against respondent.

On October 26, 1908, the respondent paid into the court the sum of $15,151.04, being the amount of the judgment, costs, and interest to date, which was invested on November 28, 1908, under order of the court, at three per cent for the benefit of the parties to the cause, without prejudice.

The only points involved in the appeal concern the action of the trial court in finding for the respondent on its first set-off and in finding January 18, 1908, as the date from which interest should be allowed on the amount due appellant.

I.   The appellant assigns as error that the court allowed interest on the account against which set-offs were asserted, from the date that the suit was commenced, whereas, appellant contends, interest should have been allowed from May 10, 1907, the date of appellant's appointment as trustee.

The statute as to interest, section 3705, Revised Statutes 1899, provides: "Creditors shall be allowed to receive interest at the rate of six per cent per annum, when no other rate is agreed upon, . . . and on accounts after they become due and demand of payment is made."

In the stipulation of the parties appears the following clause pertaining to the question of interest: "That up to the time of filing the suit in this case the defendant has always stood ready and willing to pay the amount claimed in the petition, to-wit, $18,784.75, less the three amounts claimed in the different set-offs and the amount in the counterclaim, amounting to $4308.74."

Appellant's contention is that his appointment as trustee was sufficient to start the running of interest under said section 3705, and that the stipulation of the parties hereinbefore quoted was sufficient to show that a demand had been made.

A "demand," in the sense in which it is used in the above statute, has been defined as "A requisition or request to do a particular thing specified, under a claim of right on the part of the person requesting." Bouv. Law Dict., "Demand." [Brackenridge v. State (Tex.), 11 S. W. 630.] It has also been held that the specific word "demand" need not be used in making

149 App—29

such a legal request, but it is sufficient if any words are used which are understood by both parties to be a demand. Furthermore, it has been held that the existence of a demand may be shown by circumstantial evidence or may be inferred from acts and declarations of the parties as proven by direct evidence. But the evidence in this case falls far short of measuring up to the requirements of what constitutes a legal demand and does not show sufficiently that such a demand was made. The fact that the respondent was "ready and willing at all times to pay the amount" is not sufficient evidence that the appellant was ready and willing to receive it; much less that appellant had made a request or requisition to pay the amount specified as due him under a claim of right. The declarations of the respondent only go to show the willingness on its part as a debtor to pay and the unwillingness of the creditor to receive payment; besides, the claim of interest being made by appellant, the burden of proof was upon him to show such right by reason of having made the required demand. We cannot find, under this showing, that the court erred in allowing interest from January 18, 1908, the date the suit was filed.

II. Appellant contends that the court erred in allowing respondent's first set-off in the sum of $3970.24. The ground of this contention is that the evidence failed to show the several elements necessary to constitute a novation of the contract of May 7, 1904, between the respondent and the Coal Creek Coal & Mercantile Company so as to make the Randolph-Macon Coal Company liable to the respondent for the balance due under the contract.

The reading of this contract shows that it was the intention of the parties thereto that if the Coal Company shipped 3300 cars over the lines of the respondent company within the time therein prescribed, then no charge was to be made on such company for the building of the switch track, although the material used therein remained the

property of the Railroad Company. It is also to be noted that in order to secure the shipment of the full quota of cars therein provided for by section 4 of said agreement, the Coal Company agreed to furnish the railroad company a surety company's bond in the penal sum of $10,000, conditioned that the Coal Company should, during the period of three years, commencing on the date of the first carload of mercantile coal, of 30,000 pounds, ship over the lines of the Railway Company not less than 3300 cars of mercantile coal, "it being understood that the cost of said track is approximately $6600; that the same will be charged on the books of the Railway Company and a credit will be allowed by the Railway Company upon the amount so charged of two dollars per car upon each car of mercantile coal shipped by the Coal Company over the lines of the Railway Company to stations other that Yates, Mo."

The evident purpose of this contract, on the part of the Railway Company, was to secure the transportation of 3300 cars of coal over its lines during the period of three years. This construction is borne out by the further provision that after the three years, the Railway Company could take up and remove the rails from the switch upon giving the Coal Company thirty days notice of its intention so to do. The evident purpose of the entire contract, construed in the light of the situation, was that the Railroad Company was willing to expend the amount of money necessary for laying the switch track provided it could get business enough from the Coal Company to repay it for its outlay, and it was estimated that the movement of 3300 cars would be sufficient for that purpose. The provision as to the fixing of the sum of two dollars per car was a bookkeeping proposition agreed to because the tariff charges for services in transporting each car as estimated would be for an amount sufficient to allow the company to credit the two dollars on the price of construction. The effect of this contract was to create the relation of debtor and creditor between

respondent and the Coal Creek Coal & Mercantile Company, and to make the debt payable in three years upon the contingency that the debtor should not have shipped 3300 cars of mercantile coal over respondent's lines during that period. The obvious intention of the respondent in transferring the account on its books was to extinguish the obligation of the Coal Creek Coal & Mercantile Company and to substitute the Randolph-Macon Coal Company in its place, which, if properly done, would constitute a novation. In order, then, that the Randolph-Macon Coal Company may be held liable for the payment of this debt, it must be shown that all three interested parties agreed that the Randolph-Macon Coal Company should be substituted in the place of the Coal Creek Coal & Mercantile Company. In other words, to constitute a novation by the substitution of a new debtor there must be a mutual agreement among three parties —the creditor, his immediate debtor, and the intended new debtor—whereby the liability of the last named is accepted in place of that of the original debtor in discharge of the original debt.

The evidence shows no agreement between the Coal Creek Coal & Mercantile Company and the Randolph-Macon Coal Company that the latter would assume and agree to pay the obligation of the former and be substituted in its stead under the contract with the Railway Company. By the terms of sale, the latter company, for a valuable consideration, acquired part of the property of the former company, but it nowhere appears that it assumed or agreed to pay any of its obligations or was to be substituted in its stead under any of its contracts; nor does it appear that there was any merger of the two corporations. No promise to pay the debts of the former company could be implied from the sale. The evidence all seems to show that the Randolph-Macon Coal Company, and Murlin in particular, never saw the contract between the Coal Creek Coal & Mercantile Company and the respondent, or knew of its existence; and while they

knew of the actual existence and operation of the switch track, there is not any proof that at the time of the purchase they had any actual or constructive knowledge by whom or on what terms it was constructed. By the terms of the sale, none of the money, accounts, books of account, papers or documents of the Coal Creek Coal & Mercantile Company passed to the Randolph-Macon Coal Company, and, consequently, the latter never obtained possession of this contract, which was one of the "papers and documents" of the selling company, and, as we have said, never saw it, so far as the evidence goes in this case. If Murlin had seen this contract, he would have couched his letter in different terms. In every clause of the contract in which the two dollars is mentioned it appears not as a "refund," but as a credit, which was never to be paid in cash but was to be applied on an indebtedness and only to the extent of the debt. If he had seen the contract and if his company had assumed the debt, he would have claimed the benefits of all such credits since the "date of shipment of the first car" (August, 1904), and not "since the purchase of that company last March" (1905), and would have asked that they be applied towards the cost of the switch in accordance with the contract. The letter also tends to show that Murlin did not think it was a credit, but that it was cash, for which the Coal Creek Coal & Mercantile Company was sending in bills to which he thought his company was entitled. The very fact that he was going to send respondent's claim department a statement of the number of cars shipped, also shows that he thought it was a cash refund of some sort. In fact, the letter shows on its face that Murlin's information was seemingly based on a vague rumor which he had heard, rather than actual knowledge of the terms of the contract in regard to the switch. This letter was written in 1905 when some business men still thought it right and proper to receive refunds from railroads, and Murlin evidently thought there was some such "arrangement" in this case.

If so, he wanted his company to get the benefit of it. At any rate, the letter cannot be construed as showing any satisfactory proof of the existence of an agreement by the Randolph-Macon Coal Company to pay this debt.

Nor does the evidence show an agreement between respondent and the Coal Creek Coal & Mercantile Company that the latter was to be released from its obligations under the contract and the Randolph-Macon Coal Company substituted in its stead. The only agreement between these parties which could be deemed to bear on this point was that contained in the seventh clause of the contract of May 7, 1904, that "this agreement shall extend to and be binding upon the lessees, purchasers, successors and assigns of the parties hereto." Surely these words could not be construed into an agreement that upon sale of its properties, the Coal Creek Coal & Mercantile Company was to be released from the payment of $6600 which might be due under the contract and that the purchaser was to be substituted in its place. The purchaser might have been an irresponsible person. The mere fact that two years after the sale, and fifteen months after respondent received notice thereof, respondent transferred the charge upon its books to the Randolph-Macon Coal Company does not indicate such consent, because it was never communicated to the Coal Creek Coal & Mercantile Company, and does not amount to a meeting of the minds. No one can enter into an agreement with another party by merely making entry on his books, of which the other party has no notice or knowledge.

Nor does the evidence show an agreement between respondent and the Randolph-Macon Coal Company that the Coal Creek Coal & Mercantile Company was to be released from its obligations under the contract and that the Randolph-Macon Coal Company was to be substituted in its stead. On the contrary, the evidence shows that the minds of the parties never met on this proposition. There is not a word in Murlin's letter

which can be construed as an agreement by the Randolph-Macon Coal Company to pay the debt of the Coal Creek Coal & Mercantile Company. Respondent never answered Murlin's letter. Fifteen months afterward, and after the bankruptcy of the Randolph-Macon Coal Company, respondent transferred the account and credits on its books from the Coal Creek Coal & Mercantile Company to the Randolph-Macon Coal Company, and never communicated its action to either of said companies. In addition to that, it charged the Randolph-Macon Coal Company with $6600 as the cost of the switch, whereas it had only charged the Coal Creek Coal & Mercantile Company with $5416.24. Surely there was no satisfactory evidence of any meeting of minds on this proposition, and the mere transfer of the account on the books, uncommunicated, could not have that effect.

One method of perfecting a novation is for all three interested parties to meet together at one time and in one place and then and there make their several agreements; but the novation could be perfected and would become valid if accomplished in any other way. In the present case, the original contract was made on May 7, 1904, the sale by the Coal Creek Coal & Mercantile Company to the Randolph-Macon Coal Company was made on February 16, 1905, Murlin's letter was written December 12, 1905, the Randolph-Macon Coal Company was adjudged a bankrupt on February 20, 1907, and on March 1, 1907, the account was transferred on the respondent's books. In order that a third person may be substituted in the place of a debtor under a contract, the creditor and the debtor and the third person must all agree that the original debtor be released and the third person be substituted in his stead, and unless these facts be shown to exist, the creditor is not entitled to offset his debt in an action by the third person. The mere transfer of the debt on the books of the creditor without the knowledge or consent of the debtor and the third person is insuffi-

cient. [29 Cyc. 1130; 21 Am. and Eng. Ency. Law, 660; 29 Cyc. 1136; 21 Am. and Eng. Ency. Law, 662; Lee v. Porter, 18 Mo. App. 377, 383; Spaunhorst v. Link, 46 Mo. 197, 199; Hageman v. Southern Elec. R. Co., 202 Mo. 249, 259, 260; 100 S. W. 1081; Griggs v. Day, 136 N. Y. 152, 158, 159; American Valley Co. v. Wyman, 92 Mo. App. 294, 300.] The burden of proof rests on him who asserts there has been a novation to establish it. [Cutting v. Whittemore, 54 Atl. 1098.] A contract of novation must be proven, and is never to be presumed, and must be clearly established by evidence of a discharge of the original debt and of an express agreement or acts of the parties clearly showing the intention to work a novation. [29 Cyc. 1139.]

Under the evidence and the authorities referred to, we find that the court erred in allowing the first set-off of $3970.24. The judgment is therefore reversed and the cause remanded with directions to the trial court to disallow the first set-off of $3970.24, and allow interest on $18,446.25 from January 18, 1908, to October 8, 1908, amounting to $797.48, making the balance due the plaintiff on October 8, 1908, $19,243.73; and that the plaintiff be allowed interest on $19,243.73 from October 8, 1908, at the rate of six per cent per annum. All concur.