Belmont C. JOHNSON and Valera Johnson, Respondents,

v.

MERCANTILE TRUST COMPANY NATIONAL ASSOCIATION, a corporation, Appellant.

No. 57644.

Supreme Court of Missouri, Div. No. 1.

May 13, 1974.

Motion for Rehearing or to Transfer to Court en Banc Denied June 10, 1974.

**34**

Rosecan & Popkin, Alan E. Popkin, St. Louis, for respondents.

Thompson, Mitchell, Douglas, Neill, Guerri & Elbert, Edwin D. Akers, Jr., St. Louis, for appellant.

HIGGINS, Commissioner.

Action by Belmont C. Johnson and Valera Johnson, his wife, for rescission of agreement to purchase 1,240 shares of capital stock of the Farmers and Merchants Bank of St. Clair, Missouri, owned by Mercantile Trust Company National Association; return of $128,967.02, representing principal and interest paid pursuant to the agreement; payment of $2,000 expended in defense of title to the stock; and cancellation of a note for $45,000 representing balance remaining on the purchase price. Counterclaim by Mercantile Trust Company National Association for recovery of $45,000 with interest on the note. The court found the issues for plaintiffs, rescinded the stock purchase agreement, ordered payment to plaintiffs of $160,662.02, and voided the $45,000 note, subject of defendant's counterclaim. (Appeal taken prior to January 1, 1972.)

Much of the evidence offered by both sides was documentary. Plaintiffs' version of the facts came primarily from Belmont

C. Johnson; defendant's version came primarily from William A. Borders, an officer of defendant Bank, and Edward M. Edleson, a former employee of plaintiffs.

For purposes of this appeal, the facts may be stated as found by the trial court:

"On February 17, 1965, Security Trust Company loaned Arthur Lewis, Virginia Lewis and Plez Lewis Company the sum of $155,000.00 on six separate notes (hereinafter referred to as the Lewis Family notes). These notes were secured by a pledge of 1240 shares of the capital stock of the Farmers and Merchants Bank of St. Clair, Missouri (hereinafter referred to as the Lewis Family stock). This loan was made on behalf of Security Trust Company to the Lewises by Mr. William A. Borders, the then President of Security Trust Company.

"In July, 1965, Security Trust Company was merged into defendant Mercantile Trust Company National Association (hereinafter referred to as 'Mercantile') and the Lewis notes with the Lewis stock as security became the property of Mercantile.

"At the time of the merger, defendants Mercantile had other loans which it had made to the Lewis Family and had charged off. Lewis' business was also in the throes of bankruptcy. William A. Borders, after the merger, became an officer of the Mercantile Trust Company and a member of its Board of Directors and he was embarrassed by having made the Lewis loan and was eager to dispose of it.

"Mr. Borders dealt with a group of businessmen from Kansas City who were interested in acquiring the Lewis stock so as to gain control of the Farmers and Merchants Bank of St. Clair. Mr. Borders told the group from Kansas City, on advice from counsel, that he could not sell them the Lewis stock but could only sell them the Lewis notes. The group from Kansas City backed out, as it was apparent that the makers of the notes were in deep financial difficulty and that the collateral was very difficult to sell.

"Thereafter and in the fall of 1965, plaintiff Belmont C. Johnson developed an interest in acquiring control of the Farmers and Merchants Bank of St. Clair. Belmont C. Johnson was at the time a successful business man in St. Clair, Missouri, owning a trailer company, a finance company, a heating and air conditioning company and a furniture store.

"There were at that time four thousand shares of the capital stock of the Farmers and Merchants Bank of St. Clair issued and outstanding and something in excess of two thousand shares was, therefore, necessary for control of the bank.

"It was general knowledge in the St. Clair community that the Lewis family had twelve hundred forty shares which they had put up to secure a loan at Mercantile. Plaintiff Belmont C. Johnson owned several hundred shares in his own name, had the right to vote other shares, and could contract to buy still others, to the end that with the 1240 Lewis shares he would have control of the Farmers and Merchants Bank.

"Accordingly, during the late fall of 1965, plaintiff Belmont C. Johnson contacted Mr. Borders and inquired into the availability of the Lewis shares. Johnson informed Borders and Borders understood that Johnson wanted the Lewis family stock so as to control the Farmers and Merchants Bank. Borders confirmed that Mercantile held the Lewis shares as security for the Lewis loan and advised Plaintiff Belmont C. Johnson that Mercantile was willing to sell him the stock but could not do so until February 17, 1966. Borders explained that the sale of the stock could not take place until that date because the Lewis loan would not be in default until then, and defendant could not sell the stock until the notes were in default. Several telephone conversations were had prior to any meeting between the parties and the totality of the discussion in those

telephone conversations was concerned with the sale by defendant Mercantile of the Lewis stock to plaintiff Belmont C. Johnson.

"Three face to face meetings were held between the parties. At these face to face meetings, Borders was the chief spokesman for Mercantile and plaintiff Belmont C. Johnson was chief spokesman for himself. The first meeting was held around the first part of February, 1966 in Borders' office at Mercantile Trust Company. Borders repeated to plaintiff Belmont C. Johnson that defendant Mercantile was willing to sell him the Lewis shares but had to wait until February 17, 1966 because the Lewis loan would not be in default until that date and that the bank could not sell the stock until the loan was in default. Price was discussed and Borders told Johnson that the price was $125 per share. Johnson tried to buy the shares for less, offering $100 per share. Whenever price was discussed it was discussed in terms of so much per share. Borders was firm in insisting on $125 per share but during this first meeting Johnson tried to purchase the shares for less. The first meeting between the parties was concluded without any firm commitment by either party.

"On February 16, 1966, Borders called Johnson and said the time was getting short and that Mercantile could sell the Lewis stock the next day. Johnson replied that he would check with one Sherwood Kitchell to make sure that he, Johnson, had a deal for Kitchell's stock. Johnson then confirmed his deal with Kitchell and called Borders on the afternoon of February 16, 1966 and made an appointment to meet with Borders at Mercantile on February 17, 1966.

"On February 17, 1966 Johnson met with Borders at Mercantile Trust Company and Borders on behalf of defendant Mercantile agreed to sell plaintiff Belmont C. Johnson the Lewis stock for $125 per share and Johnson agreed to buy the stock from Mercantile for $125 per share. The terms were that Johnson was to pay $25,000.00 down and he and his wife, Valera Johnson, were to sign a note for the balance of $130,000.00, which was to be secured by the 1240 shares of stock and the $130,000.00 balance was to be reduced from time to time. Borders said they should wait until after February 17, 1966, as the Lewis notes were technically not in default until that date. Borders and Johnson agreed to close on February 21, 1966 and Borders agreed on behalf of Mercantile that defendant Mercantile would see to it that the Lewis shares were transferred to Johnson on that date.

"On February 21, 1966, plaintiffs Belmont and Valera Johnson went to defendant Mercantile's office to close the purchase of the Lewis shares. Defendant Mercantile did not prepare a written agreement fully setting out the terms of the transaction. The only documents which plaintiffs were given at the time of the transaction was a note for $130,000.00 and a collateral pledge agreement listing the Lewis notes with the stock as security. There was a notation alongside each of the Lewis notes that they had been foreclosed as of February 21, 1966. The collateral pledge agreement listed the 1240 shares of the Farmers and Merchants Bank of St. Clair as collateral for plaintiffs' loan. Moreover, internal records of Mercantile also indicated that the notes were considered foreclosed as of February 21, 1966, and that the real collateral was the 1240 shares of stock.

"At no time during any of the meetings were plaintiffs or anyone representing plaintiffs shown the Lewis notes nor were plaintiffs nor anyone representing them told that they were being sold the Lewis notes and at no time during any of the meetings were plaintiffs or anyone representing them told of any endorsement placed or to be placed on the Lewis notes. Notwithstanding, the Lewis notes were endorsed by Borders to Belmont C. Johnson. There was, however, no acknowledgment on such endorsement either signed or in-

itialed by plaintiff Belmont C. Johnson, and the Court finds that such endorsement was placed on the Lewis notes without the knowledge, consent or approval of plaintiffs.

"After plaintiffs had signed the collateral pledge agreement and note defendant Mercantile sent one of its representatives to the Farmers and Merchants Bank of St. Clair with the Lewis stock certificates. When said representative arrived at the Farmers and Merchants Bank he, together with plaintiff Belmont C. Johnson, went to the office of Mr. Gene Dixon, an officer of the Farmers and Merchants Bank of St. Clair, and caused him to cancel the Lewis certificates and issue new certificates in the name of plaintiff Belmont C. Johnson in the amount of 1240 shares. The representative of the defendant Mercantile then took the certificates representing the 1240 shares issued by the Farmers and Merchants Bank of St. Clair with him to be held as collateral for the Johnson loan with Mercantile.

"Plaintiff Belmont C. Johnson voted the said shares thereafter during 1966, 1967 and 1969.

"During the year 1968 plaintiff Belmont C. Johnson was informed by an officer of the Farmers and Merchants Bank of St. Clair that some question had been raised concerning the title of the stock that plaintiff Johnson believed he had purchased from defendant Mercantile. Shortly thereafter and on the 6th day of September, 1968, a lawsuit was filed by the Farmers and Merchants Bank of St. Clair in the Circuit Court of Franklin County, Missouri, seeking a declaratory judgment as to the true owner of the Lewis shares. Defendant Mercantile was named a party defendant to said lawsuit in Franklin County but declined to participate therein and accordingly was dismissed.

"Plaintiff tendered the defense of the lawsuit in which the title to the Lewis shares was being questioned to defendant but defendant declined to assume such defense.

"The Circuit Court of Franklin County found that defendant Mercantile had not sold plaintiff stock as it had represented to him but had merely sold plaintiffs the Lewis notes. Plaintiffs tendered the prosecution of an appeal to defendant but defendant declined to prosecute such appeal and the judgment therefore became final.

"From the time of the execution of the note by plaintiffs they have paid the defendant the sum of $110,000.00 in principal and the sum of $18,967.02 in interest, for a total of $128,967.02.

"Plaintiffs expended the sum of $2,383.75 as and for reasonable attorneys fees in attempting to defend the title to the stock which defendant had promised to sell them, which defense they tendered to defendant; plaintiffs expended or became obligated for the sum of $5,238.75 legal fees and $322.50 expenses in the prosecution of this action, for a total of $7,945.00.

"The interest, computed at 6% simple interest on the $110,000.00 principal payments made by plaintiffs to defendant since 1966 totals $23,750.00.

"In order to restore plaintiffs to the status quo prior to the agreement they must recover of defendant the following:

| | |
|---|---|
| Principal paid by plaintiffs to defendant | $110,000.00 |
| Interest paid by plaintiffs to defendant | 18,967.02 |
| Interest on monies paid by plaintiffs to defendant | 23,750.00 |
| Cost of Union litigation | 2,383.75 |
| Legal fees and costs in instant litigation | 5,561.25 |
| Total | $160,662.02 |

"There is presently a renewal note executed by plaintiffs in the amount of $45,000.00 which is held by defendant in connection with this transaction which still remains outstanding and unpaid."

Upon these findings, the court concluded:

" * * * that plaintiffs have shown by clear and convincing evidence that defend-

ant agreed it was selling plaintiffs the Lewis stock, and plaintiffs have shown by clear and convincing evidence that they justifiably believed they were purchasing the stock and not notes.

"* * * that defendant, contrary to its promise, did not sell plaintiffs the Lewis stock but instead merely sold them the Lewis notes with the Lewis stock as security, and endorsed the Lewis notes without plaintiffs' knowledge, approval or consent, which endorsement the Court has concluded is of absolutely no force and effect and is null and void.

"* * * that this case rests peculiarly upon the credibility of the witnesses and this Court, having heard the witnesses testify and observed their demeanor as they did so, is clearly convinced that defendant had agreed to sell plaintiffs stock and not notes.

"The assessment of attorneys' fees and interest as an element of damages lies within the sound discretion of the trial court in an action in equity and this Court finds that the assessment of such attorneys' fees and interest in this case is particularly appropriate."

■ Judgment for plaintiffs was rendered accordingly. It shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 73.01(d), V.A.M.R.; § 510.310(4), RSMo 1969, V.A.M.S.; Thomas v. Milfelt, 222 S.W.2d 359, 362 (Mo.App. 1949); Basman v. Frank, 250 S.W.2d 989, 992 (Mo.1952); Tobin v. Wood, 159 S.W. 2d 287, 290 (Mo.1942); Wintz v. Johannes, 331 Mo. 536, 56 S.W.2d 109, 115 (1932).

Appellant contends (I) that the court erred in its judgment "because plaintiffs have obtained full title and ownership to the 1,240 shares of stock of Farmers and Merchants Bank."

In support, appellant emphasizes the transfer of the stock to Belmont C. John-son on books of the Farmers and Merchants Bank on February 21, 1966, and argues that by virtue of the transfer Belmont C. Johnson has "full legal title and ownership of the 1,240 shares of Lewis stock and that is exactly what he claims he wanted. It is immaterial whether such transfer was made by Mercantile, as pledgee of the Lewis stock, or by Johnson, as Mercantile's transferee. * * * such transfer was made and was effective to give Johnson title to the stock * * *."

The difficulty with this position is that it accords no significance to the declaratory judgment suit, Farmers and Merchants Bank of St. Clair, a banking corp. v. Belmont C. Johnson, et al., No. 6964, Circuit Court of Franklin County, Missouri, filed September 6, 1968. In addition to the Johnsons, other defendants were the Lewis family and Mercantile Trust Company National Association. The issue was whether the Lewis family or the Johnsons owned the stock in question. Defendant Mercantile elected not to participate in the suit and moved the suit be dismissed against it by virtue of 12 U.S.C.A. § 94, a venue statute of which Mercantile took advantage. Prior to filing his responsive pleading Belmont C. Johnson tendered defense of the lawsuit to Mercantile, Mercantile declined to defend title to the stock, and the suit went to trial with Mr. Johnson undertaking to defend title to the stock. Representatives of Mercantile were present and testified at the trial. The court adjudicated that the Lewis family was the owner of the stock in question to the exclusion of the Johnsons. Following trial, the Johnsons tendered the appeal to Mercantile; and, upon failure to prosecute an appeal, the judgment became final.

■ The effect of the Franklin County judgment was that of an involuntary transfer of title to the stock from the unsuccessful party Johnsons) to the other (Lewises), i. e., "a conclusive determination" that title in the stock was in the Lewises. Restatement of Judgments, § 110.

Consequently, there is a judgment by which title to the stock that the Johnsons thought they had purchased was vested in the Lewises. Yet, Mercantile would invite retrial of the issues resulting· in a judgment that Lewises do not have title. Lewises are not a party to this action, and Mercantile's suggestion could result in two final, contrary judgments. Mercantile had a direct interest in the subject matter of the Franklin County suit. It was given every opportunity to assert that interest but declined to do so. It was present at trial and its representatives were witnesses. It was given every opportunity to appeal the judgment adverse to its purported conveyance of title to the Johnsons. There is no indication that the Johnsons failed in any respect in the attempted defense of their title to the stock. In these circumstances, the judgment in Franklin County is res judicata, and Mercantile is estopped from asserting its present position with respect to ownership of the stock in question. Mercantile falls within the general rule " 'that a person not made party of record to the suit is nevertheless bound by any judgment rendered therein, if he has a direct interest in the subject-matter of the suit and has the right * * * to make defense or control the proceeding.' " Leesburg State Bank & Trust Co. v. Merchants Bank of Kansas City, 142 S.W.2d 94, 96[6] (Mo.App.1940).

Appellant contends (II) that the court erred in its judgment "because such judgment is clearly against the weight of the evidence and against the weight of the credible evidence." In support, appellant asserts that "plaintiffs' case consisted solely of Belmont Johnson's own version of what occurred * * * which is in direct and irreconcilable conflict with his prior testimony in depositions and in the Franklin County case and which is in conflict with the testimony of William Borders, Richard Skouby, Ray Weber and Ed Edleson * * *."

It was for the trial court to resolve conflicts in the evidence. The court made a specific conclusion of law in this respect by which plaintiffs' version of the facts was accepted, and it was determined that defendant agreed to sell plaintiffs stock and not notes. This conclusion was presented specifically for reconsideration by defendant's motion for new trial. In these circumstances, deference to the trial court's finding on the credibility of the witnesses is appropriate. Tobin v. Wood, supra.

Appellant contends (III) that the court erred in allowing plaintiffs attorney's fees and costs of $7,945. The argument is that the award "was erroneous for the simple reason that nowhere in this record is there any evidence of a single cent having been expended by plaintiffs for attorneys fees or costs in any action, including the Franklin County action or this suit." Appellant asserts that the only evidence of such fees and costs was an exhibit which was never introduced or received in evidence.

The record refutes this contention. Exhibit 25 was a summary of legal fees and cash outlays of Belmont C. Johnson in connection with the declaratory judgment action in Franklin County totaling $7,955. During the testimony of Belmont C. Johnson, the following occurred:

"Q Let me show you now what has been marked as Plaintiffs' Exhibit 25 and would you tell us what that is, in general terms? A These are attorneys' fees and so forth. * * * Q And those are a summary of what you have paid our firm, are they not, in connection with the case down in Union? A Yes, sir. Q And in connection with this lawsuit, is that right? A Yes. Q And I notice that the part of it is an estimate of what this lawsuit is going to cost you? A Yes. Q And that's what I gave you, is that right? A Yes, sir. Q. What is the total amount of fees and expenses that have been paid or are to be paid according to that?"

Next appears colloquy between counsel, after which the following occurred: "THE

COURT: I am going to allow it in on the basis I will hold it in abeyance. If you should prove to the court it's not allowed, it will be stricken from the record. MR. AKERS: You are taking it subject to the objection? THE COURT: Subject to the objection."

Exhibit 25 was thus clearly in evidence, and the finding in this respect demonstrates that it was considered in that the court adopted the same figures for fees and costs as represented by the exhibit.

Appellant argues also that, in any event, attorney's fees are not allowable in this type of action in Missouri. In support, appellant cites City of Grandview, Missouri v. Hudson, 377 F.2d 694 (8th Cir. 1967); Arnold v. Edelman, 392 S.W.2d 231 (Mo. 1965); Pine Lawn Bank and Trust Company v. Urbahns, 417 S.W.2d 113 (Mo.App. 1967); Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), for its proposition that attorney's fees are not allowable in absence of a contract or statute "unless there are very unusual circumstances."

 This case is one in which appellant's general rule is not applicable. There is no question that the Johnsons tendered the defense and appeal of the Franklin County lawsuit to Mercantile and that they, in undertaking to defend that suit, attempted to defend the title to the stock Mercantile had agreed to convey to them. Nor is there any question that the fees and costs allowed are not reasonable. The question of attorney's fees and costs in this case thus come within the rule that "Where * * * the natural and proximate result of a wrong or breach of duty is to involve the wronged party in collateral litigation, reasonable attorneys' fees necessarily and in good faith incurred in protecting himself from the injurious consequence thereof are proper items of damages." State ex rel. Moore v. Morant, 266 S.W.2d 723, 727

(Mo.App.1954); 25 C.J.S. Damages § 50e, p. 787; Myers v. Adler, 188 Mo.App. 607, 176 S.W. 538 (1915); 25 C.J.S. Damages § 50, p. 781; Duncan v. Townsend, 325 S.W.2d 67 (Mo.App.1959); Allstate Insurance Co. v. Hartford Accident & Ind. Co., 311 S.W.2d 41 (Mo.App.1958). Without the allowance of fees and costs plaintiffs are not restored to the position they enjoyed prior to this abortive transaction.

Appellant contends (IV) that the court erred in its award of interest to plaintiffs of $23,750. In support, appellant asserts that the right to interest, if it exists at all, must be based upon contract or statute. See, e. g., McManus v. Burrows, 206 Mo. App. 528, 230 S.W. 129, 131 (1921); Boyle v. Crimm, 363 Mo. 731, 253 S.W.2d 149, 157 (1952); § 408.020, RSMo 1969, V.A. M.S. Appellant asserts also that the record is barren of evidence of any demand for interest. See, e. g., Scott v. Ferguson, 235 Mo. 576, 139 S.W. 102 (1911); Babbitt v. Chicago & A. Ry. Co., 149 Mo.App. 439, 130 S.W. 364 (1910); Trimble v. Kansas City, P. & G. R. Co., 180 Mo. 574, 79 S.W. 678, 681 (1904); Springli v. Mercantile Trust Co., 333 S.W.2d 311 (Mo.App.1960); Laughlin v. Boatmen's Nat. Bank of St. Louis, 354 Mo. 467, 189 S.W.2d 974, 980 (1945). Appellant asserts finally that under these authorities plaintiffs' right to interest, if so, could not have accrued prior to June 18, 1970, the date on which their first petition (and demand) was filed.

This contention is also refuted by the "unusual" nature of this rescission suit. The court concluded specifically that interest as well as attorney's fees was an element of damages lying within the sound discretion of the court in an action in equity and that the assessment here made was "particularly appropriate."

One of plaintiffs' claims was that interest was necessary to restore them to their status quo prior to this transaction. Exhibit 24 summarized certain interest payments made on the $110,000 principal as of

trial, April 21, 1971, calculated at six per cent per annum, and the court made its judgment computations at a later date. Appellants do not demonstrate inaccuracy in the court's computations, relying instead upon its assertion that the court could not properly award interest.

 Accordingly, the interest awarded in this rescission case was within the " 'axiom * * * that he who has the use of another's money, or money he ought to pay, should pay interest on it.' " Laughlin v. Boatmen's Nat. Bank, supra, 189 S.W.2d l. c. 979. See also 37 C.J.S. Fraud § 143, p. 478, that " * * * where the purchaser rescinds and returns the property received, * * * in such cases he may properly recover the amount he paid with interest from the date of payment * * * "; and see Cannon v. Bingman, 383 S.W.2d 169, 174 (Mo.App.1964), approving an award of interest from the date of payments on the contract in a rescission case, and distinguishing Boyle v. Crimm, supra. And see, finally, Schroeder v. Zykan, 255 S.W.2d 105 (Mo.App.1953), holding plaintiffs entitled to interest from date of payment in a rescission suit.

 Appellant's Point V is that the court erred in refusing its counterclaim; however, since the court properly rescinded the agreement between the parties, as demonstrated, defendant's counterclaim going to a part of that agreement was also properly denied and its subject, the note, cancelled.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the judges concur.