CLAUDE WINTZ v. ETHEL JOHANNES, WILLIAM WINTZ, EMILY WINTZ, ALBERT J. MICHEL and J. B. HEINZER, Defendants, WILLIAM WINTZ, EMILY WINTZ and ALBERT J. MICHEL, Appellants.—56 S. W. (2d) 109.

Division Two, December 14, 1932.

*Fred J. Hoffmeister* for appellants; *Forest P. Tralles* of counsel.

*Foristel, Mudd, Blair & Habenicht* for respondent.

HENWOOD, J.—This is a suit in equity wherein Claude Wintz, plaintiff below, seeks to have cancelled certain deeds which purport to be conveyances of certain real estate situate in the city of St. Louis, and to have the title to said real estate determined. The defendant Ethel Johannes is the plaintiff's sister, and she and the plaintiff are alleged to have like interests in said real estate. The trial court found in favor of the defendant J. B. Heinzer, grantee in one of said deeds, and in favor of the plaintiff and the defendant Ethel Johannes in all other particulars, and rendered judgment accordingly. The defendants William Wintz, Emily Wintz and Albert J. Michel jointly appealed.

Claude Wintz and Ethel Johannes are the children of William Wintz and Nora Wintz, deceased wife of William Wintz. For many years William Wintz and Nora Wintz owned as tenants by the entirety two pieces of real estate in the city of St. Louis described as follows:

"A certain lot of ground having a front of 80' on the south line of Kansas street in City Block No. 2967 of the City of St. Louis, by a depth southwardly and along the west line of Vermont avenue of 179' 88'' to an alley 20' wide;

"Also a lot of ground having a front of 112' 11'' on the east line of Michigan avenue in City Block No. 2944 in the city of St. Louis, by a depth eastwardly of 140' 5/8'' to an alley 15' wide."

On August 20, 1912, William Wintz and Nora Wintz conveyed said real estate, by a warranty deed, to the defendant Albert J. Michel, and Albert J. Michel conveyed said real estate, by a quitclaim deed, to Nora Wintz. These deeds were recorded two days later, August 22, 1912. Nora Wintz died intestate on December 21, 1923, and left as her heirs at law her husband, William Wintz, and her children, Claude Wintz and Ethel Wintz (now Ethel Johannes). In February, 1925, William Wintz and Emily Wintz, his present wife, were married. On March 18, 1927, there was filed for record, and recorded, in the office of the recorder of deeds of the city of St. Louis *a warranty deed purporting to have been executed by Nora Wintz and William Wintz on August 21, 1912, and purporting to convey said real estate to Albert J. Michel.* On the same day, August 21, 1912, Albert J. Michel executed a quitclaim deed which purports

to be a conveyance of said real estate to William Wintz. The words "Not to be recorded" appear on this deed, immediately following the notary's certification of the execution and acknowledgment thereof, and it has never been recorded. On May 12, 1927, there was filed for record, and recorded, in the office of the recorder of deeds of the city of St. Louis a quitclaim deed, dated March 19, 1927, purporting to be a conveyance of said real estate from Albert J. Michel to Emily Wintz. On July 22, 1927, in pursuance of a contract for the exchange of properties, Emily Wintz and William Wintz executed a warranty deed, which purports to be a conveyance to J. B. Heinzer of the Michigan Avenue property; and on the same day J. B. Heinzer, by a warranty deed, conveyed to Emily Wintz "A lot in Block 1446 of the city of St. Louis, fronting 50' on the north line of Pestalozzi street, by a depth northwardly on 123', more or less, to an alley bounded on the east by Arkansas avenue and on the west by a line 545' 8'' east of and parallel to Grand avenue." These deeds were recorded on July 22, 1927.

The plaintiff alleges in his petition that the warranty deed purporting to have been signed and acknowledged by Nora Wintz on August 21, 1912, and purporting to convey the Kansas Street property and the Michigan Avenue property to Albert J. Michel, was not in truth and in fact signed or acknowledged by Nora Wintz; that said deed is not in truth and in fact the deed of Nora Wintz; that the purported signature of Nora Wintz to said deed was forged; that by reason of said forgery said deed and all deeds thereafter executed which purport to be conveyances of said properties are void and of no force or effect; and that he and Ethel Johannes, as the only children of Nora Wintz, are the lawful owners of said properties, subject to the curtesy estate of William Wintz; and the plaintiff prays that each of said deeds be cancelled, and that he and Ethel Johannes be adjudged the owners of said properties, subject to the curtesy estate of William Wintz.

The defendants J. B. Heinzer, William Wintz, Emily Wintz and Albert J. Michel, in separate answers, deny the allegations in the plaintiff's petition. Further answering the defendant J. B. Heinzer says that, at the time he accepted the conveyance of the Michigan Avenue property from Emily Wintz and William Wintz, he relied on the advice of an expert examiner of real estate titles, who at his instance examined the chain of title to the Michigan Avenue property as shown by the records in the office of the recorder of deeds of the city of St. Louis; and that he first learned of the alleged forgery of the signature of Nora Wintz to the deed purporting to have been

executed by her on August 12, 1912, long after his acceptance of the conveyance of said property; and he prays that he be adjudged the owner of said property. Further answering the defendant Emily Wintz admits the allegations in the separate answer of the defendant J. B. Heinzer; and she says that she is the lawful owner of the Kansas Street property and the Pestalozzi Street property; and she prays that she be adjudged the owner of said properties. Further answering the defendant William Wintz admits the allegations in the separate answer of the defendant J. B. Heinzer. The defendant Ethel Johannes filed no answer.

At the trial all of the parties agreed that the title of J. B. Heinzer to the Michigan Avenue property, as evidenced by the conveyance of said property to him by Emily Wintz and William Wintz, be confirmed, and that, for the purpose of determining the rights of the heirs at law of Nora Wintz, the Pestalozzi Street property conveyed by J. B. Heinzer to Emily Wintz be substituted for and in the place of the Michigan Avenue property.

The plaintiff testified: His father and mother, William Wintz and Nora Wintz, owned and operated a tea and coffee store in the city of St. Louis for many years prior to 1912. His mother did the inside work, waiting on customers and packing orders, keeping books and accounts, and looking after the financial end of the business; and his father did the outside work, soliciting and delivering orders of goods. They started in business "on nothing," and built up the business and accumulated property through their joint efforts. In the afternoon of August 20, 1912, when he and his sister, Ethel, were with their mother on a vacation at Chautauqua, Illinois, his father called his mother by telephone from St. Louis, and in response to the telephone call his mother returned to St. Louis with him and his sister by train that day, and reached their home about seven o'clock in the evening. His father and mother went to Mr. Michel's office that evening, and "there was quite a discussion when they came home." He did not understand at that time what the conversation was about, but heard his mother say something to his sister about signing a deed that evening. His mother left St. Louis with him and his sister the next morning, August 21, 1912, on the seven o'clock train, and they went back to Chautauqua, where they remained two weeks. His mother did not go to Mr. Michel's office that morning, nor did Mr. Michel come to their home that morning, before they left home to take the train for Chautauqua. He was familiar with his mother's handwriting and signature. He saw her sign her name a number of times. The handwriting on Plaintiff's Exhibits A to V, including

bank checks and envelopes, is his mother's handwriting, and the signature "Nora Wintz" on Defendants' Exhibits 1, 2 and 3, three deeds, is his mother's signature. The signature purporting to be the signature of Nora Wintz on Plaintiff's Exhibit W, the warranty deed which purports to have been executed August 21, 1912, and which purports to convey the Kansas Street and the Michigan Avenue properties to Albert J. Michel, is not his mother's signature. He never saw this deed prior to the time it was filed for record, March 18, 1927. From August 20, 1912, until the time of his mother's death, his father never claimed to own the Kansas Street and Michigan Avenue properties. Throughout that period his mother exercised the rights of ownership of said properties and managed and controlled the same, paying the taxes, arranging for and paying for repairs, and collecting rents and giving receipts therefor. At different times in 1913 and 1914 he heard four or five conversations between his father and mother, in which his father proposed that they obtain a loan on said properties or dispose of a part of said properties and use the funds so obtained in expanding and promoting their interests in an automobile tire business, and his mother always "refused to do it." On one of such occasions, his father said "he had been a fool to put the property in that shape, he couldn't use it," and his mother was glad "the property was in that shape so the money couldn't be taken from the property to be spent upon the tire business." In 1921, the day before his mother was taken to a hospital for a serious operation, "she made the statement the property was in her name and not necessary to make any will; that the property was in such shape it would be taken care of properly." On that occasion his mother also said the property would " be equally divided between the three of us (her husband and two children); she received expert advice on that." These statements were made in the presence of his father, and his "father didn't say anything about that at all." In 1922, the night before his mother was taken to a hospital again for treatment, "Mrs. Dolan pled with mother to make a will and asked her if the property was in proper shape, and she said it was in such shape it would be taken care of; it would not be necessary to make a will." Two or three months after his mother's death he talked to his father about an administration on his mother's estate, and his father said "it was not necessary." When he learned that his father was going to get married again, he told his father he "thought the thing should be cleared," and his father said "not to worry about anything, upon his death the property would come to sister and I; he just said the property had been left in the condition that it belonged to sister and I, but he felt like, as long as he had helped to earn it, as long as he lived he was entitled to the income

from it." Shortly after his father's marriage, in 1925, his father told him that he and his wife "had signed an agreement whereby the property upon his death would come back to sister and I." On this occasion he told his father "if it was not taken care of," he "was going to see it was taken care of." After that, he and his father again "discussed the details of the property," and his father again said he and his wife "had made an agreement that upon his death the property would come to Ethel and I." In March, 1927, the probate court, at his instance, issued a citation directed to his father, and when notified about the proceeding his father called him "on the phone" and said "he was going to fight it to the end." On cross-examination he testified: He had seen some deeds which his mother kept in a tin box with some insurance papers, but did not know "what kind of deeds they were." After his mother's death his father kept the deeds in a tin box and "kept them locked up." He never had any of the deeds in his possession and never had an argument with his father about the deeds. He did not at any time ask his father "to put a deed of trust on the property for $5000."

The defendant Ethel Johannes was called as a witness for the plaintiff, and her testimony is substantially the same as the testimony of the plaintiff as to the manner in which her father and mother conducted their business affairs, the telephone message received by her mother at Chautauqua, Illinois, on August 20, 1912, her mother's trip with her and her brother to St. Louis on that day, their return trip to Chautauqua the next morning, her father's proposals and her mother's refusals to use the property in her mother's name for the expansion and promotion of their automobile tire business, and the conversations between her father and her brother concerning an administration on her mother's estate. When asked what was said by her father and mother after August 20, 1912, as to the ownership of "the property," she said: "It was always thought and understood mother owned it, and in her name. I have heard dad ask her several times to transfer it back and she said 'Never.' She always said she would never sign it back." She also testified that she was familiar with her mother's handwriting and signature; that she had seen her mother sign her name numerous times; that the handwriting on Plaintiff's Exhibits B to U, including bank checks and envelopes, was her mother's handwriting; that the signature "Nora Wintz" on Plaintiff's Exhibit W, the warranty deed which purports to have been executed on August 21, 1912, and which purports to convey the Kansas Street and Michigan Avenue properties to Albert J. Michel, is not her mother's signature; and that she had never seen this deed prior to the trial of this case. On cross-examination she said the signature "Nora Wintz" on Defendants' Exhibits 1 and 2, old

542

deeds, is her mother's signature, and that the signature "Nora Wintz" on Defendants' Exhibit 3, the warranty deed which purports to have been executed by her father and mother on August 20, 1912, and which purports to convey the Kansas Street and Michigan Avenue properties to Albert J. Michel, is not her mother's signature. This is the deed which the plaintiff claims, and the contesting defendants admit, was executed by William Wintz and Nora Wintz at the same time Albert J. Michel, by a quitclaim deed, conveyed said properties to Nora Wintz, and in this particular only the testimony of this witness is at variance with the testimony of the plaintiff.

John M. Trendley testified, on behalf of the plaintiff: He had examined disputed handwritings as a handwriting expert for thirty-three years, had passed on signatures to checks and signatures on payrolls for ten years as assistant paymaster of the Terminal Railroad Company at St. Louis, and had given expert testimony on disputed handwritings in more than two hundred cases. Before taking the witness stand he examined the handwriting on Plaintiff's Exhibits B to V, including bank checks and envelopes, and the signature "Nora Wintz" on Plaintiff's Exhibit W, the warranty deed which purports to have been executed by Nora Wintz on August 21, 1912, and, in his opinion, the handwriting on Plaintiff's Exhibits B to V and the signature "Nora Wintz" on Plaintiff's Exhibit W were not written by the same person. He based his opinion on "eight or ten divergencies in the writing." These divergencies appear in the pen strokes and in the shaping and shading of the letters in the signature "Nora Wintz" on Exhibit W. "The signature on Exhibit W is a more deliberate attempt at writing; that is, not that free, crude writing you find in the other exhibits." The signature on Exhibit W "shows halting or hesitating, studied effort so characteristic of forgery." On cross-examination he testified: In his opinion, the purported signatures of Nora Wintz on Defendants' Exhibits 1, 2 and 3 are genuine. The signature on Defendants' Exhibit 3 "looks like the one that is copied" on Plaintiff's Exhibit W. The signature on Plaintiff's Exhibit W "is written more in a detailed manner, taking the time like copy work; it lacks that free writing" which appears in the signature on Defendants' Exhibit 3. He was paid by plaintiff to testify as a handwriting expert, and had no personal knowledge of the matters involved in this case.

The defendant William Wintz testified: When he and his first wife (Nora Wintz) were married they had $65 between them. They conducted "the business together," and accumulated the Kansas Street and Michigan Avenue properties through their joint efforts. Various deeds were executed in 1912 "to protect" him and his wife.

"There was a threatened lawsuit," and he "felt like" he and his wife and children were "entitled to all" he and his wife had made. He "made the property to her to protect her, and she made the deed to protect" him. On August 20, 1912, he and his wife executed the warranty deed (Defendants' Exhibit 3) by which they conveyed the Kansas Street and Michigan Avenue properties to Albert J. Michel, and at the same time Albert J. Michel executed the quitclaim deed (Plaintiff's Exhibit A) by which said properties were conveyed to his wife (Nora Wintz). These deeds were made for the purpose of protecting him "in case anything came up." The next day, August 21, 1912, he joined with his wife in excuting the warranty deed (Plaintiff's Exhibit W) by which said properties were again conveyed to Albert J. Michel, and Albert J. Michel executed another quitclaim deed (Defendants' Exhibit 4) by which said properties were conveyed to him (William Wintz). These deeds were made for the purpose of "protecting one another (him and his wife) in case anything came up." They were acknowledged before Frank H. Michel, a notary public. He and his wife agreed that the quitclaim deed (Defendants' Exhibit 4), by which said properties were conveyed to him, should be recorded after her death or "in case anything should happen" before her death, and for that reason the words "Not to be recorded" were written on the deed. His wife agreed to "all of these things," and their children never heard him and his wife "have an argument." After the death of his first wife (Nora Wintz) he sold "the business" to his son for $1,500 and took his son's note for that amount. The note was not due at the time of the trial, and would not be due for "about two years." His son moved into the Michigan Avenue property when he took charge of the tea and coffee store, and was still living there at the time of the trial, but had paid only about one year's rent. They "lived together until things began to go wrong," and then "he walked out and got married and went away." About two years thereafter his son "claimed an equity in the property" and wanted a loan of $5,000 on a note. On March 19, 1927, he had Albert J. Michel make the quitclaim deed (Plaintiff's Exhibit Z) by which the Kansas Street and Michigan Avenue properties were conveyed to his present wife (Emily Wintz). He and his present wife had an understanding when they were married that they "would give the equity in the property to the children if the children were satisfied." His "son went through with the business and wasn't satisfied." It was then he had the quitclaim deed made, the conveyance from Albert J. Michel to his present wife (Emily Wintz). He was not influenced to do this by the proceeding in probate court which his son had started at that time. The exchange of the Michigan Avenue property

for the Pestalozzi Street property between his present wife (Emily Wintz) and J. B. Heinzer was made on July 22, 1927, because his son was not paying "any rent" for the use of the Michigan Avenue property. At the time his first wife (Nora Wintz) died the title to their property was in the name of Albert J. Michel, and his attorney advised him that it was not necessary to have an administration on her estate. His first wife kept all of their papers in two tin boxes. A few months after he and his second wife were married he discovered that the deeds involved in this suit were not in either of these tin boxes. His son at first said he knew nothing about the deeds, but, later, his son turned the deeds over to him. When asked, on direct examination, if he was positive that he and his wife went to Mr. Michel's store on two different occasions to sign deeds, he said: "I am pretty sure we did; the deeds show on two different days." When asked, on cross-examination, if his wife and children were in Chautauqua, Illinois, on August 20 and 21, 1912, he said: "I wouldn't say on the 20th or the 21st; I didn't keep no record of it." He further testified, on cross-examination: He was threatened with a suit for alienation of the affections of another man's wife when, on August 20, 1912, the conveyances were made by him and his first wife (Nora Wintz) to Albert J. Michel and by Albert J. Michel to his first wife (Nora Wintz). He did not have any trouble with this man about his wife, but "on account of financial matters." He "had a deed of trust on his (this man's) house" which he sold to a bank, and that was the cause of the trouble. The conveyance by his first wife and him to Albert J. Michel on August 21, 1912, was made by them to "protect one another." His son "perjured himself" when he testified that he did not ask him (the witness) for a loan of $5,000, but, as far as he remembered, everything his daughter told was "the truth."

The defendant Albert J. Michel and his brother, Frank H. Michel, were also called as witnesses on behalf of the contesting defendants. Albert J. Michel had a hardware store at 7130 South Broadway in the city of St. Louis, and his brother had a real estate office in one corner of the store, where he wrote conveyances and took acknowledgments thereto as a notary public. Both had known William Wintz and his family for many years, and Frank H. Michel had written or directed the writing of "legal documents" for William Wintz "at different times," including the deeds involved in this suit. Both Albert J. Michel and Frank H. Michel testified that William Wintz and his wife, Nort Wintz, came to the store on August 20, 1912, and signed and acknowledged, in their presence and before Frank H. Michel as a notary public, the warranty deed (Defendants' Exhibit 3) by which the Kansas Street and Michigan Avenue proper-

ties were conveyed to Albert J. Michel, and Albert J. Michel executed the quitclaim deed (Plaintiff's Exhibit A) by which said properties were conveyed to Nora Wintz; and that Nora Wintz and her husband, William Wintz, came back to the store the next day, August 21, 1912, and signed and acknowledged, in their presence and before Frank H. Michel as a notary public, the warranty deed (Plaintiff's Exhibit W) by which said properties were conveyed to Albert J. Michel, and Albert J. Michel executed the quitclaim deed (Defendants' Exhibit 4) by which said properties were conveyed to William Wintz. Albert J. Michel further testified: About August 20, 1920, Mr. Wintz came in the store and wanted some deeds made. "He wanted to make several deeds between me and his wife; I don't remember exactly what they were now; the idea was, as he explained to me, for him to protect his wife and his wife to protect him, in case something happened to either one or the other they would be cared for." He was merely the "straw man" in the transaction. The body of the warranty deed (Defendants' Exhibit 3), dated August 20, 1912, and the body of the quitclaim deed (Plaintiff's Exhibit A), dated August 20, 1912, were written in his brother's handwriting. The body of the warranty deed (Plaintiff's Exhibit W), dated August 21, 1912, was written on a typewriter at the store by his nephew, twelve or thirteen years old, who worked at the store after school hours. He did not "know exactly why it, was drawn up." The first set of deeds were executed "around before noon," and the second set of deeds were executed "early in the morning, half past 7 or 8 o'clock." On cross-examination, when asked about the dates of these two sets of deeds, he said: "Don't ask me about deeds, I am not certain on dates, either. I wouldn't be able to tell you dates; I remember according to the papers; the papers are more specific than I am; I can't remember in my mind what happened those days years ago." He further testified, on cross-examination: William Wintz talked to him about making these deeds "a week or ten days" before they were made. "He (William Wintz) said at one time there was a possibility, he was in some other business where there might be a lawsuit come up, and he wanted to protect his wife against losing anything." When asked why he executed one quitclaim deed (Defendants' Exhibit 4) by which he conveyed said properties to William Wintz on August 21, 1912, and nearly fifteen years later executed another quitclaim deed (Plaintiff's Exhibit Z) by which he conveyed said properties to Emily Wintz (present wife of William Wintz), he said: "I done it for Billy Wintz; he wanted it made, evidently; if he wanted it made that way, I made it as his request, no doubt. I don't know anything about it; I was merely a third party in that. I have no explanation to make;

the papers speak for themselves. Wintz and my brother were the ones concerned. I didn't ask a thing about it; I had confidence to know they were doing the right thing." Frank H. Michel further testified: The second set of deeds, dated August 21, 1912, were executed "early in the morning." There was nothing said at that time "about why these deeds were being executed." He wrote the words "Not to be recorded" on the quitclaim deed (Plaintiff's Exhibit 4) "on the request of Mr. Wintz." On cross-examination he testified: The first set of deeds, dated August 20, 1912, were executed "in the forenoon." The second set of deeds, dated August 21, 1912, were executed in the morning, "probably 8 o'clock; around that time." His nephew wrote the second warranty deed (Plaintiff's Exhibit W) on a typewriter at the store that morning. When Mr. Wintz and his wife came back to the store that morning he "never asked them" why they changed their minds. When asked which deed he made first, he said: "It is dated there the 20th—the 20th day of August, 1912." When asked if the first deed was executed about 9 o'clock in the evening of August 20, 1912, he said: "I don't remember at all."

In rebuttal for the plaintiff, his sister (the defendant Ethel Johannes) testified: At the time of her mother's death her father attended to all business matters of importance. He took charge of the tin box in which her mother kept "all the papers." On cross-examination she said her father "took care of the deeds" and "had all the valuable papers to the property" after her mother's death.

The trial court found that, under the pleadings and the evidence and the admissions of the plaintiff, the plaintiff and the defendant Ethel Johannes elected to approve the conveyance of the Michigan Avenue property to the defendant J. B. Heinzer in exchange for his conveyance of the Pestalozzi Street property to the defendant Emily Wintz, and that the plaintiff and the defendant Ethel Johannes further elected to take in lieu of their interests in the Michigan Avenue property like interests in the Pestalozzi Street property; and the trial court further found that the warranty deed (Plaintiff's Exhibit W), dated August 21, 1912, "does not bear the genuine signature of Nora Wintz," and that said deed is null and void as to Nora Wintz, and that the defendant Albert J. Michel did not thereby acquire the interest of Nora Wintz; and the trial court further found that, by said deed, the defendant William Wintz conveyed to Albert J. Michel his curtesy estate, and that, by the quitclaim deed (Plaintiff's Exhibit Z), dated March 19, 1927, Albert J. Michel conveyed said curtesy estate to Emily Wintz; and the trial court adjudged that the defendant J. B. Heinzer is the owner of the Michigan Avenue property, and that the plaintiff and the

defendant Ethel Johannes each have an undivided one-half interest in the Kansas Street and Pestalozzi Street properties, subject to the curtesy estate of the defendant Emily Wintz in the right of the defendant William Wintz.

The sole question presented for our determination is whether the evidence is sufficient to support a finding that the purported signature of Nora Wintz to the deed in question (Plaintiff's Exhibit W), dated August 21, 1912, is a forgery.

It is admitted that William Wintz and his wife, Nora Wintz, acquired the Kansas Street and Michigan Avenue properties with savings from their joint efforts; that they owned said properties as tenants by the entirety for many years prior to 1912; that on August 20, 1912, said properties were conveyed by them to Albert J. Michel (Defendants' Exhibit 3), and by Albert J. Michel to Nora Wintz (Plaintiff's Exhibit A); and that said conveyances were recorded two days later, August 22, 1912.

According to the testimony of the plaintiff and his sister, their mother, Nora Wintz, left St. Louis with them on a 7 o'clock train in the morning of August 21, 1912, for a visit of two weeks in Chautauqua, Illinois, and did not go to Albert J. Michel's store before leaving St. Louis that morning; they had often seen their mother sign her name, and were familiar with her signature; the purported signature of their mother to the deed in question is not her signature, and they never saw or heard of said deed before it was filed for record, March 18, 1927; from August 20, 1912, until the time of their mother's death, December 21, 1923, their mother exercised the rights of ownership of said properties, and "it was always thought and understood" that the title to said properties was "in her name"; in 1913 and 1914 and thereafter they heard their father ask their mother "to transfer it back," and "she always said she never would sign it back;" in 1921 and again in 1922, when their mother was preparing to go to a hospital for medical treatment, she said it was not necessary for her to make a will because the property was "in such shape it would be taken care of properly," and on the latter occasion she said the property would be "equally divided" between her husband and her children in case of her death; these statements of their mother were made in the presence of their father, and he said nothing with reference to such statements; after their mother's death their father told them he was entitled to the income from the property as long as he lived, but upon his death the property would belong to them. The plaintiff's case is further supported by the testimony of his witness Trendley, a handwriting expert of long experience in passing on handwritings and signatures as an assistant paymaster of a railroad company and in giving expert

testimony on disputed handwritings. After examining numerous papers and documents admittedly written or signed by Nora Wintz, and after comparing said admittedly genuine handwritings and signatures of Nora Wintz with the purported signature of Nora Wintz to the deed in question, this witness gave it as his opinion that the purported signature of Nora Wintz to said deed is not her signature, and pointed out what he called "divergencies" in the pen strokes and in the shaping and shading of the letters in the purported signature of Nora Wintz to said deed.

The defense rests on the notary's certificate of the acknowledgment of the deed in question and the testimony of William Wintz, Albert J. Michel and Frank H. Michel. While each of these witnesses said the two sets of deeds, dated August 20, 1912, and August 21, 1912, respectively, were signed and acknowledged in their presence and before Frank H. Michel as a notary public, neither of them had any independent recollection as to the dates when said deeds were signed and acknowledged. When William Wintz was asked if he was positive that he and his wife went to Mr. Michel's store on two different occasions to sign deeds, he said: "I am pretty sure we did; *the deeds show on two different days."* When asked if his wife and children were in Chautauqua, Illinois, on August 20 and 21, he said: "I wouldn't say on the 20th or the 21st; I didn't keep no record of it." In response to a similar inquiry, Albert J. Michel said: "Don't ask me about deeds; I am not certain on dates. I wouldn't be able to tell you dates; *I remember according to the papers; the papers are more specific than I am;* I can't remember in my mind what happened those days years ago." When Frank H. Michel was asked which deed he made first, he said: *"It is dated there the 20th —20th day of August, 1912."* When asked if the first deed was executed about 9 o'clock in the evening of August 20, 1912, he said: "I don't remember at all." The only explanation offered by William Wintz of the two sets of deeds was that they were made "to protect" him and his wife against a threatened lawsuit. In this connection, he said: "I felt like my wife was entitled to all we had made and *my children* and myself." He offered no explanation of his failure to record the deed in question until March 18, 1927, fourteen years and five months after the date it purports to have been executed and three years and four months after the death of his first wife, when he was threatened with a proceeding in the probate court for the discovery of assets of his first wife's estate. He did not contradict the testimony of his son and daughter that their mother exercised the rights of ownership of the Kansas Street and Michigan Avenue properties from August 20, 1912, until the the time of her death; that in 1913 and 1914 and thereafter he asked

their mother "to transfer it back," and she always refused to do so; that he remained silent in 1921 when their mother said in his presence the property was in "such shape it would be taken care of properly," and in 1922 when she said in his presence the property would be "equally divided" between her husband and her children in case of her death; and that after their mother's death he told them he was entitled to the income from the property as long as he lived, but upon his death the property would belong to them. And it appears from the testimony of Albert J. Michel, the "straw man," and Frank H. Michel, the notary public, that everything they did in connection with the deeds involved in this suit, including the deed in question, was done at the suggestion and under the direction of William Wintz.

As shown by the testimony of William Wintz, Albert J. Michel and Frank H. Michel, the contesting defendants plant themselves behind the notary's certificate of the acknowledgment of the deed in question. Our statute, of long standing, now Section 3050, Revised Statutes 1929, says: "Neither the certificate of the acknowledgment nor the proof of any such instrument nor the record nor the transcript of the record of such instrument, shall be conclusive, but the same may be rebutted." Under this statute a notary's certificate of an acknowledgment is only *prima-facie* evidence of the facts recited therein.

It is true that in effect we consider all equity cases *de novo*. But, where, as here, the evidence presents a sharp issue of fact, we usually defer to the finding of the chancellor because he is in a better position to pass on the credibility of the witnesses and to determine the probative value of their testimony. With these advantages, the chancellor in this case weighed the evidence and found in favor of the plaintiff on the issue of forgery. We are not only inclined to defer to his finding, but we do not hesitate to say that, as we view the record, his finding is supported by clear, cogent and convincing evidence. [See Albright v. Stevenson, 227 Mo. 333, 126 S. W. 1027.]

It follows that the judgment rendered below should be affirmed. It is so ordered. All concur.