ESSEX CONTRACTING, INC., and Federal Insurance Company, Appellants/Cross–Respondents,

v.

JEFFERSON COUNTY, Missouri, Respondent,

Patrick J. Acheson, et al., Respondents,

J.H. Berra Paving Co., Inc., and Boling Concrete Const., Inc., Respondents/Cross–Appellants.

No. SC 89407.

Supreme Court of Missouri, En Banc.

Feb. 24, 2009.

649

Dana Hockensmith, Hockensmith Tatlow McKinnis Hammill, P.C., St. Louis, MO, for Appellants/Cross-Respondents.

Ted F. Frapolli, The Law Firm of Ted F. Frapolli, St. Louis, MO, for Respondents/Cross-Appellants Boling Concrete Const., Inc.

Pamela M. Triplett, Law Offices of Donald B. Balfour, Chesterfield, MO, for Respondents/Cross-Appellants J.H. Berra Paving Co., Inc.

Paul V. Rost, Emily Rushing Kelly, Ryan A. Moehlman, Cunningham, Vogel & Rost, St. Louis, MO, for Respondents Patrick J. Acheson, et al.

Dennis Kehm, Jr., Jefferson County Counselor, Hillsboro, MO, for Respondent Jefferson County, Missouri.

PER CURIAM.

**Factual Background**

Essex Contracting, Inc., was the developer of the Winter Valley subdivision in Jefferson County. Essex agreed to adhere to the county subdivision regulations, which required that a bond be posted or that the improvements be constructed before final plat approval. Essex sought approval before construction and, so, posted three separate bonds for each of the three phases of construction. The bonds totaled $3,598,249.79 and were provided by Federal Insurance Co. In the summer of 2000, the time for completing the streets was drawing near, but Essex had not yet completed the streets. In exchange for a one-year extension of the completion deadline, Essex agreed to a "Guarantee Under Subdivision Regulations" with Jefferson County. The Guarantee incorporated the previous bonds and bond obligations.

The Guarantee provided that the bonds were issued to ensure that "the construction, installation and completion of the required subdivision improvements in Winter Valley Subdivision" were "all in accordance with the Subdivision Regulations of Jefferson County" and that if Essex "aban-

don[ed] the Subdivision or fail[ed] to complete the improvements within one (1) year hence from the date of the COUNTY'S approval of this Guarantee Agreement," the county would complete the improvements and would gain control of the bond. Under the terms of the Guarantee, Essex was obligated to complete all repairs by July 26, 2001—one year from July 26, 2000, the date of the Guarantee.

The process for releasing the bonds is as follows. After a developer asserts that construction and any needed improvements are completed, the county inspects the property and makes a recommendation to the county commission as to whether to release the bond. The county commission then decides whether the improvements have been made. If the county determines that improvements have not been made, then the county refuses to release the bonds to the developer, and instead, takes control of the bonds to make the repairs itself.

The plat was approved initially, and construction began in 1995. There were three phases in the construction of the Winter Valley concrete streets: 1) Essex was responsible for clearing and grading the land comprising the subdivision; 2) after the land had been cleared, Essex leveled the dirt, a process referred to as preparing and compacting the subgrade (the soil beneath the streets) for the streets; and 3) Boling Concrete and Berra Paving contracted with Essex to pour the streets in a slip-form paving technique in which the concrete is poured in a continuous fashion and control joints are added later, creating the look of separate slabs of pavement.

The process was completed in 1998. After construction, the concrete in some of the roads began to split and crack, and Essex replaced some of the damaged street sections, with Boling and Berra also making some of the repairs.

The repairs revealed that there were problems with the thickness of some of the concrete poured. The subdivision regulations mandate certain thickness levels in the concrete of streets, with the requirement that deficiencies of greater than 0.3 inches necessitate replacing the slabs. In 2000, because of concerns about the thickness of the pavement, the county ordered Essex to test the thickness of the concrete using core sample testing. Testing revealed that in several places, the concrete was thin by more than 0.3 of an inch, in violation of the subdivision regulations.

Essex had Boling and Berra pay for and replace some of the deficient slabs. The county contended that the testing was unsatisfactory, however, and in 2005, court-ordered core testing revealed that there were an additional 218 slabs of concrete deficient in thickness by more than 0.3 inches.

After making repairs following the court-ordered testing, Essex sought release of the bond to Essex, asserting that it fully had completed the necessary improvements and developments. The county commission refused to release the bonds and provided Essex with a list of deficiencies in the completion of the construction.

## Procedural History

After another request for release, denial and receipt of a deficiency list, Essex sought declaratory judgment on May 15, 2001, seeking full release of the bonds, alleging that it fully had completed the improvements. On July 12, 2001, the county conceded that some of the improvements had been made and released part of the bond. After the partial release, $1,015,837.79 of the bond remained unreleased. Essex maintained its suit for full release of the bond, and the county counter-sued Essex, adding Federal as a third-

party defendant for its failure to disburse the bonds to the county. Federal cross-claimed against the county for a declaratory judgment, stating either that the bonds were void or that the improvements were complete.

Members of the Winter Valley Homeowners' Association were granted leave to intervene and filed a petition for injunctive relief, declaratory relief and damages against Essex, alleging various counts of negligence, breach of contract and zoning enforcement.

Essex filed third-party petitions against Boling and Berra for indemnity, adding claims for breach of contract.

At trial, one of the county's expert witnesses, Daniel Barczykowski, a licensed geotechnical engineer, testified that typical subdivision streets are designed to have a life of 20 to 30 years. Barczykowski testified there are four factors that impact the quality and longevity of a street: 1) design life; 2) type and volume of traffic over the design life period; 3) the quality of the concrete; and 4) the condition of the subgrade and soil support. Barczykowski identified four problems within the subdivision: 1) settlement of fill; 2) poor subgrade support; 3) shrinkage of concrete after curing and 4) steep grade. Barczykowski identified only settlement and poor subgrade support in connection with slabs necessitating replacement.

Evaluating the potential causes of these problems, Barczykowski testified that there were no failures in design; that the volume of traffic was no more than the streets had been designed to withstand, and therefore, could not be responsible for the cracking and failures; and that the quality of the concrete was sufficient to prevent premature failing. By elimination, Barczykowski determined that poor subgrade condition and support was responsible for the streets' failures.

There was evidence at trial that concrete trucks were allowed to drive on the subgrade during the pouring, an activity that would have disturbed the subgrade condition. The Boling pavers attempted to recompact the subgrade after the trucks had disturbed it, but in at least one spot, they were unable to do so because the trucks had brought in so much moisture that the dirt could not be recompacted. Although Essex had tested the subgrade before the trucks drove on it, it did not retest the subgrade support after the trucks disturbed it. This evidence supported Barczykowski's view that poor subgrade support was at least partially responsible for the failing concrete.

Although there was no evidence at trial that the insufficient thickness of the concrete was exclusively or primarily responsible for the concrete failing, the county and intervenors argued that the thinness of the concrete potentially could affect the longevity of the streets and, further, that Essex was obligated under the subdivision regulations to conform to certain thickness standards, even if the failure to conform could not be tied directly to the failure of the concrete.

The trial court found that Essex failed to meet the standards of the subdivision regulations and the requirements of the Guarantee, which mandated that Essex complete the subdivision improvements. The trial court further found that the county and intervenors were entitled to hold the bonds. The trial court ordered that Essex and Federal pay the remainder of the bonds to the county to fund the county's completion of the subdivision improvements. Because Essex failed to conform to the regulations' thickness requirements, the trial court ordered civil penalties for thin slabs in the amount of $102,174.65 against Essex and Federal, to

be paid out of the bonds. The trial court entered judgment in favor of Essex on its claims for indemnity from Boling and Berra, in the amounts of $73,913.28 and $28,261.37, respectively, reflecting each company's share in the $102,174.65 civil penalty award. The court also ordered Boling to pay Essex $6,040.72 and Berra to pay Essex $6,468.92 for the cost of testing the cores. The trial court awarded $35,875.00 in costs against Essex and Federal for the intervenors' costs for work performed to repair the prematurely failing streets. Finally, the trial court awarded the intervenors' attorneys' fees in the amount of $219,277.00 against Essex, $7,088.00 against Berra and $17,013.00 against Boling.

On appeal, Essex argues that the trial court erred in: (1) ordering Essex and Federal to pay the remainder of the bonds to the county to complete the subdivision streets because there was no substantial evidence to support the finding that Essex failed to meet the Guarantee's requirements; (2) failing to enter judgment in favor of Essex on its claim for indemnity against Boling for the full amount of the judgment; (3) awarding the intervenors $219,277.00 in attorneys' fees because the award is excessive; (4) limiting the attorneys' fees award to $7,088.00 against Berra and $17,013.00 against Boling rather than assigning Boling and Berra greater liability for the full attorneys' fees award; (5) awarding the intervenors $35,875.00 in repair costs; and (6) ruling that the county and intervenors should hold the bonds.

Boling argues the trial court erred in: (1) awarding penalties of $73,913.28 against Boling for the thin street panels; (2) assessing testing fees to Boling; and (3) assessing attorneys' fees against Boling.

Berra argues the trial court erred in: (1) entering damages of $28,261.37 against Berra for the thin-cored pavement; (2) assessing attorneys' fees against Berra; and (3) assessing testing fees to Berra.

After opinion by the court of appeals, this Court granted transfer and has jurisdiction. Mo. Const. art. V, § 10.

### Standard of Review

This Court's review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). This Court will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law, accepting all evidence and inferences therefrom in the light most favorable to the prevailing party and disregarding all contrary evidence. *Id.* at 32. Further, "[o]n appeal of a court-tried case, the appellate court defers to the trial court on factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984).

### I.

**Should Essex and Federal, jointly and severally, pay the entire remainder of the bonds in the amount of $1,015,838.00 to Jefferson County?**

*A. Did Essex breach the Guarantee by failing to complete the improvements in the required timeframe?*

Essex argues there is no substantial evidence to support the trial court's finding that Essex failed to complete its construction and improvements in accordance with the subdivision regulations. The subject matter in dispute here is high-

ly technical and was addressed almost exclusively through expert testimony. The trial court heard testimony from Essex's experts, Daniel Barnes of Brucker Earth Engineering & Testing ("Brucker Engineering"), and Brian Oliver, an Essex employee. The trial court heard extensive testimony regarding tests conducted on the streets and observations made during the streets' construction. The trial court also heard testimony from Randolph Boling, the owner of Boling; William Koehrer, the director of public works for the county; and Barczykowski. The trial court received evidence of the improvident decision not to retest the subgrade after the concrete trucks had traversed it and of the deficiencies in the thickness of many of the tested slabs.

An appellate court is not in the position of second-guessing a trial court's evaluation and weighing of evidence. In a case so fact-based and in which witness testimony is so crucial, it is particularly important that the appellate court exercise proper deference to the trial court's judgment. The role of the appellate court is not to reevaluate expert testimony through its own lens but rather to confine itself to determining whether substantial evidence existed to support the trial court's judgment.

Here, the issue was not an evaluation of causation—whether the thinness of the street slabs caused the concrete failures—but instead was whether Essex conformed to the requirements of the Guarantee by creating streets free from premature failures that passed the county's inspection prior to the full release of the bond. In the Guarantee, Essex guaranteed that all required improvements would be "installed, constructed and completed within one (1) year from the date of approval of" the Guarantee agreement, which was approved July 26, 2000. Essex had until July 26, 2001, to complete all the improvements, seek an inspection from the county, and obtain an approval and release from the county commission. Essex did not meet those requirements. The streets were cracked, their thickness did not conform to required levels and they did not pass the county's inspection. It was Essex, and not its subcontractors, that was obligated to complete improvements under the term of the Guarantee. The trial court's finding that Essex breached the Guarantee by failing to complete the subdivision streets pursuant to the subdivision regulations is supported by substantial evidence.

*B. Did the trial court err in holding that the remainder of the bonds should be released to the county so that the county could complete necessary repairs?*

■ The language of the Guarantee provides that if the developer, Essex, "shall abandon the Subdivision or fail to complete the improvements within one (1) year hence from the date of the COUNTY'S approval of this Guarantee Agreement, the County may complete, or have completed, the said improvements and the SURETY shall disburse on the land subdivision bonds therefore, as ordered and directed by the COUNTY." The trial court made a finding that

Essex's failure to perform any more work in the Subdivision, to complete the improvements prior to July 26, 2001, as required by the County and the Guarantee Agreement, and its filing of the lawsuit in June of 2001 claiming that the Subdivision was complete, is tantamount to an abandonment of the Subdivision, in direct contravention to the Guarantee Agreement.

A finding of abandonment is not necessary to a holding that the bonds should be released to the County, and this Court does not reach a conclusion as to whether Essex's actions constitute abandonment.

As discussed above, however, Essex did fail to complete the improvements within one year of the Guarantee, which is the other triggering condition for releasing the bonds to the county.

Because Essex failed to complete the necessary improvements within the mandated time frame, the trial court's judgment that the amount of money remaining in the bonds should be released to the county is affirmed.

## II.

### Boling's Liability

*A.   Should Boling be held liable for the premature failing of the subdivision streets?*

Essex argues the trial court erred in failing to enter judgment in favor of Essex and against Boling on Essex's third-party claim.   It contends Boling was responsible for any failing concrete streets that it constructed, because Boling's vehicles drove on the subgrade prior to construction of the streets.   Essex argues, therefore, that it should have prevailed on its claim for full indemnity from Boling.

■   The trial court does not specify why exactly Essex is not entitled to indemnity on the full amount of the judgment. Indeed, some of the language in the trial court's findings seems quite damning to Boling's defense against indemnity.   The trial court states that "there is no evidence of any negligence or failure of Essex to properly perform construction of the streets."   In its brief, Boling points this Court to the provision of its contract with Essex that states that Boling is to

> have access road along one (1) side of new pavement area to allow for equipment/materials to be transported.   Failure to provide the necessary access road will require loaded Ready Mix trucks and equipment to drive on finished sub-

grade releasing Boling Concrete of all liability and making the Developer liable for the following:   A.  Pumping Sub Grade.   B.  Possible thin pavement and or C.  Over pour of the required concrete thickness resulting in a back charge of extra material to the Developer.

Boling cites this provision as the reason it should not be held liable for any failure in subgrade support caused by its trucks driving over the initially compacted subgrade.   Essex alleges that there were access roads available and, therefore, that this contractual provision does not relieve Boling of liability for the street failures.

The trial court agreed, finding that it "disagree[d]" with Boling's contention that the access roads were not available.   The trial court stated that "the testimony of all witnesses, except Randy Boling, was that there were access roads to all lots for constructing the subdivision streets."   This finding is inconsistent with the trial court's refusal to assign greater liability to Boling for the full judgment.   If it is the case that thin concrete and poor subgrade support caused the streets to fail, as the trial court concluded, and Boling was responsible for some of the thin concrete and the uneven subgrade, then the trial court should have sustained Essex's claim for indemnity. The trial court's judgment awarding Essex less than full indemnity against Boling is reversed, and the case is remanded.   On remand, the trial court can evaluate Essex's claim for indemnity against Boling.

*B.   Did the trial court err in assessing penalties of $73,913.28 against Boling and $28,261.73 against Berra for street pavement with thin cores?*

Boling argues that it should not have been assessed $73,913.28 in penalties for the thin core streets it laid.   To support that argument, Boling makes three conten-

tions: 1) the Appendix E ordinance requiring replacement of streets thin by more than 0.3 inches was enacted after it laid the pavement; 2) the trial court lacked substantial evidence that the thin cores caused any damage to the streets; and 3) the trial court lacked substantial evidence that Boling, rather than another company called S & D, laid the concrete later found to be too thin.

As to argument (2), the impact of the thin street cores has no pertinence to the assignment of civil penalties. The subdivision regulations mandate a certain thickness, and the trial court found that several slabs failed to meet the requirement and had to be replaced, pursuant to the regulations. A measure of damages is not required to assign the penalty.

Boling's argument (1) also fails. Boling argues that although it contracted to pour streets of a specified thickness, the scale of penalties for thin concrete spelled out in Appendix E of the subdivision regulations should not apply. Appendix E was adopted in 2002, after the streets had been poured. The evidence at trial showed that at the time the streets were poured, prior to the adoption of Appendix E, Jefferson County used only an "informal system" requiring the removal of pavement that deviated by more than 0.3 of an inch from the required thickness.

Boling argues that to use Appendix E's replacement requirement to calculate the penalty for the thin concrete violates Missouri's prohibition on the retrospective application of the laws. *See* Mo. Const. art. I, § 13. As the trial court pointed out, however, "the remedies provided are not a change in substantive law, but rather provide a new remedy." "Substantive laws fix and declare primary rights and remedies of individuals concerning their person or property, while remedial statutes affect only the remedy provided, including laws that substitute a new or more appropriate remedy for the enforcement of an existing right. *Faulkner v. St. Luke's Hosp.*, 903 S.W.2d 588, 592 (Mo.App.1995). Missouri courts have interpreted statutes that affect a measure of damages as remedial." *Files v. Wetterau, Inc.* 998 S.W.2d 95, 97–98 (Mo.App. 1999). There is no constitutional prohibition on the retrospective application of a new remedy. The damages provisions spelled out in Appendix E do not constitute substantive laws and may be applied in assessing penalties to Boling.

Finally, Boling disputes in its argument (3) the trial court's finding that it was responsible for the streets that were too thin. After Essex developed concerns about the thinness of some of the streets, Essex hired a company called S & D to replace some of the concrete, a total of 566 square yards. Boling argues that Essex failed to provide any evidence that Boling, rather than S & D, poured the streets that were found to be too thin in the 2005 court-ordered core testing. Essex, as the plaintiff in its third-party claim against Boling for liability for the thin streets, had the burden of proving the existence and amount of damages within a reasonable certainty. Once that burden was met, and Essex had made out a prima facie case, the burden of proof shifted to Boling. *See Le Page v. Metropolitan Life Ins. Co.*, 314 S.W.2d 735, 738 (Mo.1958) ("There is a general rule to the effect that where plaintiff makes out a prima facie case the burden of the evidence shifts to the defendant …").

Essex presented evidence that Boling poured two-thirds of the streets in the subdivision, and the judgment of the trial court reflected the replacement costs of those streets Boling was assigned to pour. Boling failed to provide any evidence that it had not poured the damaged streets.

Because the penalty scheme described in Appendix E is a constitutionally permissible measure of damages and because Essex met its burden of proof, the trial court's judgment assigning $73,913.28 in civil penalties to Boling is affirmed.

Berra makes an identical argument to that Boling put forward regarding the lack of evidence supporting the civil penalties. For the same reasons as for Boling, the trial court's judgment in assigning civil penalties to Berra is affirmed.

C. *Did the trial court err in assigning testing fees to Boling and Berra in the amounts of $6,040.72 and $6,468.92, respectively?*

■ The trial court did not err in assigning testing fees to Boling and Berra. Boling and Berra both point to a provision in each company's contract with Essex that states, "All required testing and inspection fees, are to be paid for by the Developer or Owner." That language pertains to Essex's requirements of Boling and Berra. Boling and Berra each contracted to pour streets to a certain thickness. Neither party successfully did so. The contractual provision assumes that Essex is requesting testing and provides that Essex shall pay for any testing it seeks. The testing for which Boling and Berra were assigned the cost did not arise pursuant to the contracts between Boling, Berra and Essex. The testing fees are for the 2005 core tests the trial court ordered after Boling and Berra failed to meet the contractual obligation, exposing Essex to liability. Because the testing fees do not arise out of the contracts, the judgment of the trial court in assigning testing fees to Boling and Berra is affirmed.

### III.

### Attorneys' fees

■ Essex argues the trial court erred in awarding the intervenors $219,277.00 in attorneys' fees. It contends the award is excessive and should be reduced because the amount of the underlying judgment should be reduced.

As a preliminary matter, this Court notes that in its substitute brief submitted to this Court, Essex violates Rule 83.08. In relevant part, Rule 83.08 provides that a substitute brief filed "shall include all claims the party desires this Court to review, shall not alter the basis of any claim that was raised in the court of appeals brief, and shall not incorporate by reference any material from the court of appeals brief. Any material included in the court of appeals brief that is not included in the substitute brief is abandoned." Although the heading of Essex's point indicates that it is arguing the award of attorneys' fees is unreasonable, much of the body of the argument is devoted to the assertion that the intervenors may not be considered a "prevailing party" within the meaning of section 89.491, RSMo 2000, and are not entitled to attorneys' fees. This argument appeared nowhere in the brief to the court of appeals, and that portion of the substitute brief will not be considered by this Court.

As to whether the amount of attorneys' fees is reasonable:

In the absence of a contrary showing, the trial court is presumed to know "the character of the services rendered in duration, zeal, and ability. [The trial court] presumptively knew the value of them according to custom, place, and circumstance." The trial court is considered to be an expert on the question of attorney fees; the court that "tries a case and is acquainted with all the issues involved may 'fix the amount of attorneys' fees without the aid of evidence.'" ... The setting of such a fee is in the

sound discretion of the trial court and should not be reversed unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration. "In the absence of evidence to the contrary it is presumed that the allowance for attorney fees was for compensable services ... and that no allowance was made for noncompensable services."

*Nelson v. Hotchkiss,* 601 S.W.2d 14, 21 (Mo. banc 1980) (internal citations omitted). Given the deference afforded to a trial court's assessment of attorneys' fees, the length and complexity of the present suit, and the absence of evidence indicating the fees were unreasonable, the trial court's award of attorneys' fees in the amount of $219,277.00, is affirmed.

## IV.

### Should the award of attorneys' fees pass through to Boling and Berra?

Essex argues that Boling and Berra should be liable for the full amount of the intervenors' attorneys' fees assessed against Essex. The trial court assessed only $7,088.00 against Berra and $17,013.00 against Boling. Boling and Berra argue that they should not be liable for any amount of attorneys' fees, as the action was brought by the intervenors against Essex and not against the two concrete companies. Essex argues that Boling and Berra should be liable for the full amount of attorneys' fees, including the $219,227.00 assessed against Essex.

▪ Boling and Berra point this Court to the language in their respective contracts with Essex that provides that the developer shall be responsible for all attorneys' fees incurred to enforce the contract. This provision does not apply to the collection of attorneys' fees resulting from an action brought on behalf of the intervenors against Essex. The provisions in the Essex's contracts with Boling and Berra apply only to litigation costs and fees incurred as a result of a suit between Essex and Boling and Berra.

▪ As Boling and Berra observe, the general rule in Missouri is that attorneys' fees are only recoverable when a statute specifically authorizes recovery or when attorneys' fees are provided for by contract. *Johnson v. Mercantile Trust Co. Nat. Ass'n,* 510 S.W.2d 33, 40 (Mo. banc 1974). Essex argues that because it was not found to be negligent, it should not be liable under section 89.491 for attorneys' fees. Negligent or not, Essex was the named party in the intervenors' action. There is no statutory provision authorizing the passing through of attorneys' fees to the underlying negligent parties. As discussed above, Boling and Berra's negligence and their liability for the failures of the streets is an issue to be evaluated in the trial court.

▪ There is an exception to the general rule discussed above. " 'Where the natural and proximate result of a wrong or breach of duty is to involve the wronged party in collateral litigation, reasonable attorneys' fees necessarily and in good faith incurred in protecting himself from the injurious consequence thereof are proper items of damages.' " *Johnson v. Mercantile Trust Co. Nat. Ass'n,* 510 S.W.2d at 40 (quoting *State ex rel. Moore v. Morant,* 266 S.W.2d 723, 727 (Mo.App.1954)). Essex may well have a claim that it should be reimbursed under this rule for the attorneys' fees assessed against it in the litigation with Boling and Berra. The application of this rule, however, necessitates preliminary findings that Boling and Berra breached an agreement and that the breach resulted in Essex's liability. As

*yet, there has been no such finding in the trial court.*

As the findings and conclusions now stand, there is no basis on which to assess attorneys' fees liability to Boling and Berra. This Court reverses the assessment of attorneys' fees to Boling and Berra and remands the case so that the trial court can determine whether attorneys' fees appropriately may be given to Essex, pending a finding of liability on the part of Boling and Berra.

## V.

### Cost of Street Repairs

Essex argues the trial court erred in awarding Intervener's costs in the amount of $35,875.00 because the costs awarded were actually paid by the Subdivision Trustees, not the intervenors, and went for maintenance, rather than to improve the streets as required of Essex by the Guarantee.

As to the maintenance argument, the trial court reviewed documentation submitted by the intervenors of various costs. The trial court determined that some of the costs did constitute pure maintenance, not within the meaning of the Guarantee. The trial court determined that only $35,875.00 of the total costs the intervenors presented to the court constituted improvement costs caused by Essex's failures to meet the requirements of the Guarantee. Because this Court defers to a trial court's evaluation of fact, pursuant to *Murphy v. Carron,* this Court rejects Essex's argument that the $35,875.00 award only covers routine maintenance.

The bulk of Essex's argument is that the intervenors, who appeared on behalf of an unincorporated homeowners' association, were not the parties who actually expended money on the costs of repairs. Essex argues that the developer trustees were responsible for the repairs, rather than the intervenors. The distinction between the development trustees and the intervenors is semantic only. The evidence at trial showed that when the developer trustees resigned in 2003, the newly elected resident trustees voted to assume the assets and liabilities of the action committee, including the present lawsuit. The evidence also showed that the developer trustees referred to themselves as the Winter Valley Homeowners Association, on behalf of which the intervenors appear.

The money for the cost of repairs came from one place—a fund to which lot owners contributed. When the developer trustees were in control before resigning, that fund was in their control. When the homeowners' association took control, the fund fell to the association to maintain. The intervenors appear on behalf of the homeowners' association. The trial court correctly found that the developer trustees and the intervenors were representing the same class of people. The trial court's judgment awarding repair costs to the intervenors is affirmed.

## VI.

### Should the bond be used to fund the award of repair costs and improvements to the subdivision?

Essex objects to the language of the trial court's judgment stating that the county is entitled to "hold" the bonds to Guarantee the improvements, arguing there is no provision in the Guarantee that the county be allowed to "hold" the bond. The trial court makes clear a few lines later that by "hold," it means that "Essex and Federal, jointly and severally, are ordered to pay the entire remainder of the Bonds in the amount of $1,015,838.00 to the County pursuant to the terms of the Bonds, the Guarantee Agreement, and

Subdivision Regulations so the County may complete the Subdivision improvements consistent with the County's and Intervenor's evidence of deficiencies and in accordance with the Subdivision Regulations and approved plans." Again, Essex relies on what is essentially a semantic distinction. The county will not "hold" the bond. The surety, Federal, will pay out the remainder of the bond so that the county may complete the desired improvements. Essex argues that this expands beyond the original meaning of the bond's terms because the court is vague about precisely which "improvements" will need to be done. The record shows that the court reviewed the estimated costs of construction submitted by the county and deemed them accurate and reasonable. This Court has no reason to second-guess that judgment. Further, the county provided Essex with a detailed list of "deficiencies" that would need to be remedied to meet the terms of the Guarantee. Essex failed to remedy those deficiencies, and so the job now falls to the county. The trial court's judgment in releasing the remainder of the bond to the county to conduct the necessary improvements is affirmed.

### Conclusion

Essex breached the Guarantee by failing to make the required improvements within the specified time frame. The remainder of the bonds should be released to the county. The trial court's failure to enter judgment on Essex's claim for indemnity against Boling is reversed. The assessment of civil penalties to Boling and Berra is affirmed, as is the assessment of testing fees. The trial court's award of attorneys' fees to the intervenors from Essex in the amount of $219,277.00 is affirmed. The award of attorneys' fees to intervenors from Boling and Berra is reversed. The

award of repair fees to the intervenors is affirmed. The case is remanded.

All concur.