FILED
United States Court of Appeals
Tenth Circuit

June 3, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MONSOUR'S, INC.,

      Plaintiff - Appellee,

v.

MENU MAKER FOODS, INC.,

      Defendant - Appellant.

No. 09-3022
(D.C. No. 6:05-CV-01204-JTM)
(D. Kan.)

---

ORDER AND JUDGMENT*

---

Before **TACHA**, **KELLY**, and **HARTZ**, Circuit Judges.

      Defendant-Appellant Menu Maker Foods, Inc. (MMF) appeals from a jury

verdict awarding Plaintiff-Appellee Monsour's, Inc. damages for MMF's breach

of an Asset Purchase Contract. Both parties were food wholesalers. Monsour's

experienced financial difficulty and sought to refocus its business on the sale of

produce. MMF sought an opportunity to expand its sales into a new market area.

MMF agreed to purchase Monsour's food service inventory and to purchase

substantially all of its produce from Monsour's.

---

      * This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

On appeal, MMF contends that it is entitled to judgment as a matter of law because (1) insufficient evidence supports the liability and damages related to the food service inventory. MMF also claims it is entitled to a new trial because the district court (2) improperly excluded impeachment evidence concerning inventory reports and financial statements, and (3) prohibited MMF from contesting certain facts. In addition, MMF contends that the district court (4) committed reversible error in awarding prejudgment interest and (5) improperly awarded attorneys' fees. Aplt. Br. at 1-2, 27-28. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

Background

We take the facts in the light most favorable to Monsour's. Monsour's sold wholesale produce and grocery items in Kansas, Missouri, Arkansas, and Oklahoma. 4 App. at 4-5, 12-16. In 2001, Monsour's decided to limit its business to produce. 4 App. at 13-15. At the same time, MMF wanted to buy produce more cheaply and to acquire food service customers. 4 App. at 19-21. Each saw a "win-win" opportunity. 2 App. at 30. The companies negotiated and arrived at an Asset Purchase Agreement. 4 App. at 16-17. Monsour's provided MMF a report showing that Monsour's dry and frozen food service inventory cost $1,109,219. 4 App. at 25. MMF inspected the inventory. 2 App. at 27.

MMF promised to buy (1) "substantially all" of its produce requirements

-2-

from Monsour's and (2) an estimated $750,000 to $800,000 of Monsour's food service inventory within eight weeks. 1 App. at 36, 43; 2 App. at 27-28. It would help sell any food service inventory it did not buy. 1 App. at 36. In return, Monsour's transferred its sales staff to MMF and agreed not to compete. 1 App. at 38, 41.

Yet, instead of buying $750,000 to $800,000 of food service inventory, MMF bought $250,000 of it. 2 App. at 28. Its "best efforts" to sell the rest amounted to calling four vendors and providing phone numbers for salvage dealers. 5 App. at 17-18; 7 App. at 167-70. Bound by the contract not to compete in most food service sales, Monsour's sold only $27,000 of its leftover inventory to others. 4 App. at 48, 53.

Nor did MMF purchase "substantially all" of its produce from Monsour's. Over ten weeks, MMF bought $72,590.39 of produce from Monsour's. 4 App. at 366-67. It filled the rest of its $30,000 per week order elsewhere. 4 App. at 58. MMF also disregarded the contract's ordering procedures and created pretexts to reject produce. 4 App. at 45, 65-66, 127, 133, 137, 143-46, 310-11, 423.

Monsour's threw away hundreds of thousands of dollars of expired food. 4 App. at 45-48, 148. Four months after the agreement, it went out of business. 4 App. at 57. It then brought this diversity action for breach of contract. 1 App. at 28-48. A jury awarded Monsour's damages of $472,000 for the food service inventory and $135,849.71 for its produce. 3 App. at 48-49. The district court

denied MMF's motion for judgment as a matter of law (JMOL).  Monsour's Inc. v. Menu Maker Foods, Inc., No. 05-1204-JTM, 2009 WL 89701, at *1-2 (D. Kan. Jan. 13, 2009).  The court awarded Monsour's $155,001.67 in prejudgment interest and $307,128.80 in attorneys' fees.  Id. at *5-8.  MMF appeals.

## Discussion

### I.    Sufficient Evidence Showed Liability and Damages.

MMF argues that the evidence at trial was insufficient to prove its liability and Monsour's damages for the food service inventory.  Aplt. Br. at 30-38.  We review the district court's denial of JMOL de novo.  United Mine Workers of Am. v. Rag Am. Coal Co., 392 F.3d 1233, 1237 (10th Cir. 2004).  A court should grant JMOL if the evidence reveals "no legally sufficient evidentiary basis for a claim." Hysten v. Burlington N. Sante Fe Ry. Co., 530 F.3d 1260, 1269 (10th Cir. 2008) (citation omitted).  We reverse a denial of JMOL "'if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'"  Id. (citation omitted).  We do not "'weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury.'"  Id. (citation omitted).

The contract required all inventory to be in a "good and wholesome condition, 100% resellable condition."  1 App. at 36.  MMF claims that Monsour's did not establish this condition item-by-item for the unsold inventory.

-4-

Aplt. Br. at 30-32. MMF also claims that Monsour's did not prove each item's price under a contractual pricing formula. Aplt. Br. at 33-38. Before signing, MMF inspected Monsour's inventory valued at cost ($1,109,219). 2 App. at 27. MMF estimated *in the contract* that it would buy $750,000 to $800,000 of inventory. 1 App. at 36. A jury could infer that cost represented an upper value of the inventory and that at least $750,000 of Monsour's inventory was "in good and wholesome condition and 100% resellable" at the time of the inspection. 4 App. at 104-05, 115. After all, the parties were in agreement as to the $750,000-$800,000 estimated value — though MMF now tells us that the estimate was to prevent Mark Monsour's bank from calling a line of credit. Aplt. Reply Br. at 5. Apparently the jury inferred that the estimate established the inventory's value, and then subtracted $250,000 for inventory MMF purchased, and $27,000 for inventory Monsour's sold elsewhere. It awarded $472,000 of the $473,000 in damages that Monsour's requested. 3 App. at 48; 4 App. at 53, 161. Drawing every reasonable inference in Monsour's favor, the evidence is sufficient.

The jury's damages award conforms with the district court's instructions on how to calculate damages. 3 R. at 24, 26, 36-42. If MMF wanted more specific instructions on damages — such as one emphasizing a requirement to price each item by the contract's pricing mechanism — then it should have challenged those instructions. MMF does not appeal those instructions.

Although MMF now insists on strictly enforcing the contract's pricing

-5-

mechanism, evidence showed that, shortly after the parties signed the contract, MMF admitted that the pricing mechanism would not matter. The head of MMF instructed his employees to disregard that provision and never to pay more than current market value. 7 App. at 170. Because the formula would not have established what MMF would pay, we decline to require the formula to establish damages now.

MMF also argues that evidence of the value Monsour's inventory subsequent to the initial cost of $1,109,219 on January 14, 2002, makes it a factual impossibility that damages could have been $472,000. MMF argues that this shows that the damages could not have exceeded $250,950. Aplt. Br. at 37-38; Aplt. Reply Br. at 2-7. The jury was free to consider inventory level fluctuations, but was not required to make the inference MMF now suggests. Juries resolve potentially inconsistent evidence, not appellate courts. The estimate is sufficient to support the verdict.

## II. The Court's Evidentiary Rulings Were Not an Abuse of Discretion.

We review evidentiary decisions for an abuse of discretion. United States v. Schene, 543 F.3d 627, 642 (10th Cir. 2008).

### A. The Court May Limit Testimony about Mr. Monsour's Bank Reports.

MMF first contends that the district court improperly limited MMF's impeachment of Mark Monsour, the president and co-owner of Monsour's. Aplt.

-6-

Br. at 39-45.  Mr. Monsour was Monsour's main witness at trial.  During discovery, Mr. Monsour admitted that he once gave his bank inflated inventory reports to prevent it from calling in his company's loans and from ending its credit line.  2 App. at 374-79.  Mr. Monsour explained that he would have done anything to save his business.  Id.  MMF argues that the district court improperly limited examination about the reports (and resulting financial statements).

At trial, MMF used the false reports to impeach Mr. Monsour's testimony and records.  Mr. Monsour admitted that the inventory report was inaccurate, that there was a discrepancy between that report and other accurate reports, and that the inaccurate report was "inflated."  4 App. at 24-25, 214-16.  Citing Federal Rule of Evidence 403, the court prevented further examination tending to show that Mr. Monsour intentionally defrauded the bank.  Fed. R. Evid. 403; 4 App. at 282-83.  Under Rule 403, a court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Excluding this evidence was not an abuse of discretion.  First, no evidence suggested that Monsour's ever gave MMF falsified inventory reports or balance sheets or that MMF ever relied upon them.  Second, Mr. Monsour essentially testified that the misstatements were intentional and that he had been dishonest.  At this point, the impeachment value of further testimony diminished.

Simultaneously, the risk of unfair prejudice increased — extensively litigating unrelated reports could confuse and misdirect the jury. 4 App. at 283. MMF's invitation to infer that this could explain the fluctuating inventory amounts in Monsour's financial statements is speculation and we can see why the district court did not want the jury to explore that inference. See Aplt. Reply Br. at 12. Moreover, litigating numerous collateral matters would lengthen the trial. The court therefore acted within the wide range of permissible evidentiary rulings. Cf. Koch v. Koch Industries, Inc., 203 F.3d 1202, 1229 (10th Cir. 2000).

The dissent would reverse the judgment on the grounds that this testimony did not provide the jury with the reason for Mr. Monsour's misstatements, but only showed that there were misstatements, the amounts were inflated and the statements were prepared at Mr. Monsour's direction. We disagree with the dissent — ample testimony was elicited to impeach Mr. Monsour's credibility and the parties sufficiently litigated the issue of the inventory's proper valuation.

Consequently, the district court's Rule 403 decision was supportable. The district court was understandably solicitous, during a three-week trial involving hundreds of documents and rulings, to prevent the jury from delving into false reports that MMF never had or relied upon during the contract's formation and performance. In short, the reports are not the smoking gun on the inventory issue that the dissent makes them out to be. The district court's judgment call about their probative value and unfair prejudice is not an abuse of discretion.

-8-

**B.      The Dumpster Invoice Did Not Prejudice MMF**.

MMF next argues that the district court prejudiced MMF when it let Mr. Monsour testify about a "fraudulent invoice."  Aplt. Br. at 44.  At trial, Monsour's attempted to introduce a replacement invoice for a thirty-yard dumpster it rented to dispose of expired food.  6 App. at 304-07.  The court *excluded* the invoice as hearsay and instructed the jury to disregard it.  6 App. at 305-06.  Mr. Monsour then testified about the dumpster from his independent recollection.  6 App. at 306-08.

This did not prejudice MMF.  Monsour's proffer was not fraud on the court. Monsour's Inc., 2009 WL 89701, at *4.  Nor does it entitle MMF to more cross-examination about Mr. Monsour's alleged bank fraud.  The district court's earlier Rule 403 ruling took into account the importance of Mr. Monsour's credibility. Besides, the court cured any prejudice when it instructed the jury to ignore the invoice.  See, e.g., United States v. Hinson, 585 F.3d 1328, 1340 (10th Cir. 2009). The jury was free to evaluate Mr. Monsour's credibility.

**C.      The Court Did Not Equate Attorneys' Arguments and Evidence.**

MMF suggests that the court impermissibly instructed the jury that it may use attorneys' arguments as evidence.  Aplt. Br. at 37.  During deliberations, the jury asked how Monsour's calculated its damages.  3 App. at 50.  The court replied, "You will have to rely on your collective memory of the exhibits, other evidence, and attorneys' arguments."  3 App. at 51.  It had earlier instructed that

arguments are not evidence.  3 App. at 4, 9.

The court's reply to a question *about a party's argument* referred the jury to the evidence and the parties' arguments.  It did not conflate the two.

## III.   The District Court Did Not Improperly Establish Facts.

MMF argues that the district court improperly established facts under Federal Rule of Civil Procedure 56(d)(1).[1]  Aplt. Br. at 45-46.  We need not decide whether the district court acted properly.  MMF had a duty to object to errors, and far from objecting, it stipulated that the court correctly established these facts.  2 App. at 93-94 (Revised Pretrial Order submitted by the parties).  It therefore waived any claim of error.  See, e.g., Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co., 497 F.3d 1136, 1141-42 (10th Cir. 2007).

Alternatively, MMF's subsequent stipulation to the facts makes their establishment proper.  Its stipulation rendered any action by the district court or Monsour's irrelevant.  We find no error.

## IV.   The Court Properly Awarded Prejudgment Interest.

MMF next argues that the district court incorrectly awarded prejudgment interest.  Aplt. Br. at 46-48.  We review the court's legal analysis de novo and a prejudgment interest award for an abuse of discretion.  Loughridge v. Chiles

---

[1]  "If summary judgment is not rendered on the whole action, the court should . . . determine what material facts are not genuinely at issue. . . . The facts so specified must be treated as established."  Fed. R. Civ. P. 56(d)(1).

Power Supply Co., Inc., 431 F.3d 1268, 1288 (10th Cir. 2005). Missouri law governs. Id.; 1 App. at 42.

Under Missouri law, a court must award prejudgment interest if the contractual damages are liquidated. Mo. Ann. Stat. § 408.020[2]; Denton Constr. Co. v. Mo. State Highway Comm'n, 454 S.W.2d 44, 59-60 (Mo. 1970); Watters v. Travel Guard Int'l, 136 S.W.3d 100, 111-12 (Mo. Ct. App. 2004). A claim is liquidated if it is "fixed and determined or readily ascertainable by computation or a recognized standard." Baris v. Layton, 43 S.W.3d 390, 397 (Mo. Ct. App. 2001); see also Komosa v. Monsanto Chemical Co., 317 S.W.2d 396, 400 (Mo. 1958), partially overruled on other grounds, Martin v. Mid-America Farm Lines, Inc., 769 S.W.2d 105, 112 n.13 (Mo. 1989)). A claim may be liquidated even if the parties dispute liability and damages, and even if a court awards fewer damages than a claimant requests. Catron v. Columbia Mut. Ins. Co., 723 S.W.2d 5, 7 (Mo. 1987).

MMF argues that the damages were unascertainable because (1) Monsour's damages estimates varied and (2) the damages were ascertained only at trial. Aplt. Br. at 47-48. But disputes over the amount of damages, without more, do not make a claim unliquidated. Catron, 723 S.W.2d at 7; Denton Constr. Co., 454

---

[2] "Creditors shall be allowed to receive interest . . . for all moneys after they become due and payable, on written contracts. . . ." Mo. Ann. Stat. § 408.020.

S.W.2d at 59-60.  We uphold the award.

## V.     The Award of Attorneys' Fees Was Not an Abuse of Discretion.

Last, MMF contends the court improperly awarded fees.  Aplt. Br. at 48-52.
We review the court's legal analysis de novo and its award for an abuse of
discretion.  Combs v. Shelter Mut. Ins. Co., 551 F.3d 991, 1001 (10th Cir. 2008).
Missouri law again governs.  Combs, 551 F.3d at 1001.  Under the contract, MMF
must pay for expenses and attorneys' fees resulting from its breach.  1 App. at 42;
cf. Trimble v. Pracna, 167 S.W.3d 706, 714 (Mo. 2005) (enforcing fee clause).

First, MMF argues that it should not have to pay for time spent on
dismissed claims for fraud, punitive damages, and lost profits, nor for time spent
on the owners' individual claims.  Aplt. Br. at 50-52.  Still, a court may award
fees where the effort and proof were the same for unsuccessful and successful
claims.  See, e.g., Gilliland v. Mo. Athletic Club, 273 S.W.3d 516, 523-24 (Mo.
2009).  The district court reasonably determined that all the claims "were based
on a common core of facts."  Monsour's Inc., 2009 WL 89701, at *5.  The
records thus need not segregate which work went to which issue.  Brockman v.
Soltysiak, 49 S.W.3d 740, 745-46 (Mo. Ct. App. 2001).

Second, MMF argues that Monsour's improperly duplicated fees when it
used two attorneys instead of one.  Aplt. Br. at 50.  We disagree.  Monsour's
"used two attorneys only in key depositions and in hearings."  Monsour's Inc.,
2009 WL 89701, at *7.  The occasional use of two attorneys was reasonable in a

three-year case culminating in a three-week trial.  Id.

Third, MMF disputes the fees for Monsour's unsuccessful motion to enforce a settlement.  Aplt. Br. at 52.  The district court correctly held that attempts to enforce a settlement were expenses stemming from the breach. Monsour's Inc., 2009 WL 89701, at *6.

Fourth, MMF objects to paying for Marshall Hull's expert services.  Aplt. Br. at 52.  The district court held that "[a]lthough Mr. Hull did not testify . . . his work product at trial was a factor in Monsour's successful outcome."  Monsour's Inc., 2009 WL 89701, at *7.  Monsour's hired Mr. Hull to disprove MMF's defense that Monsour's would fail whether or not MMF breached the contract.  2 App. at 318-19.  Mr. Hull's report also detailed Monsour's lost profits, which were once at issue.  Id.  His fees therefore resulted from the breach.  Cf. Architectural Res., Inc. v. Rakey, 912 S.W.2d 676, 679 (Mo. Ct. App. 1995).

Fifth, MMF argues that counsels' billing records are "not sufficiently detailed."  Aplt. Br. at 48-50.  Monsour's submitted forty-nine pages showing "the time incurred . . . the date of the action, the timekeeper . . . the work completed and the time billed."  Aplee. Br. at 40; 3 App. at 66-114.  This enabled the court to decide which work related to the breach.  It granted fees accordingly. Monsour's Inc., 2009 WL 89701, at *5-7.

All in all, the award was not an abuse of discretion.  A court may consider a case's "length and complexity."  Essex Contracting, Inc. v. Jefferson County,

277 S.W.3d 647, 656-57 (Mo. 2009). MMF agreed with Monsour's that this action involved "a very large body of documentary evidence and numerous depositions were taken in three different states. The case was fact, witness and document intensive and clearly presented a complex legal action requiring heavy expenditures of time and labor." 3 App. at 53, 206.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

09-3022 - *Monsour's, Inc. v. Menu Maker Foods, Inc.*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent. In my view the district court abused its discretion in limiting MMF's cross-examination of Mark Monsour.

As the president and co-owner of Monsour's, Mr. Monsour had a substantial financial stake in the litigation. Also, as the panel majority states, he "was Monsour's main witness at trial." Op. at 7. His credibility was critical. The jury had a right to know whether he was the sort of person who would tell big lies when big money was at stake. But the district court prevented MMF from putting on highly probative evidence that he was such a person. And I see no countervailing reason to exclude that evidence. Allowing MMF to put on the excluded evidence would have consumed very little time, and could hardly have confused or misdirected the jury; nor would the evidence have created any risk of *unfair* prejudice.

It is useful to compare the testimony at trial to what should have been elicited. On direct examination Mr. Monsour was questioned by his attorney about two Monsour's balance sheets with the same date (which was one month before the parties entered into their Asset Purchase Agreement) but very different figures for the value of the food service inventory:

Q. Let's talk about Monsour's food service inventory. Can you tell the jury what Exhibit 447 is?

A. It's a Monsour balance sheet.

Q. This has already been admitted in evidence. Can you tell the jury, what is this based upon? I'm sorry. Bad question. What does it show the inventory was—what does it show the inventory was, that inventory at Monsour's as of December 29th, 2001?

A. $997,950.

Q. You're getting that from the line right next to what I highlighted?

A. That's correct.

Q. Was this true and accurate?

A. Yes, sir.

Q. And what was it based upon?

A. It would have been an inventory valuation done probably in the days preceding the preparation of this statement off of the inventory valuation report.

Q. This is about a month before the asset purchase agreement was executed. Do you have any knowledge as to whether or not this document was supplied to Menu Maker Foods?

A. I do not know.

Q. Can you tell the jury what Exhibit 412 is?

A. It's a balance sheet.

Q. What's the date of this balance sheet?

A. 12-29-2001.

Q. This is the exact same date as the Exhibit 447 that we went over a second ago. Tell the jury what the inventory indicates on this Exhibit 412?

A. 1,643,819.

Q. Can you tell the jury whether or not—does this balance sheet, the one that shows 1.6 million, does that reflect what the actual cost of your inventory was?

A. No.

Q. Now, the one that showed $997,000, the one I just showed you a few minutes ago, did that reflect what the actual cost of your inventory was?

A. Yes.

Q. Now, this document shows 1.6 million, Exhibit 412, was that ever provided to Menu Maker Foods?

A. No.

Q. Just so it's clear to the jury what was the actual cost of your inventory on December 29th, 2001?

A. $997,950.

Aplt. App., Vol. 4 at 23–24. Thus, Mr. Monsour acknowledged that the higher

figure (higher by about $650,000) was incorrect. But the testimony would not

suggest any lack of veracity of Mr. Monsour. He admitted no role in the error,

nor did he explain the reason for the error.

MMF's attorney tried to elicit those matters on cross-examination, both

with respect to the inventory figures and with respect to accounts-receivable

figures (on the same document) not addressed on direct examination. But because

of the district court's ruling limiting the cross-examination, the jury heard only

the following. First, counsel emphasized the differences in the figures:

> Q.   Mr. Monsour, do you have Exhibit 447 in front of you?
> A.   Yes, sir.
> Q.   Okay.  This is my copy of 447, and you will confirm I have
>       highlighted portions of that document?
> A.   Yes, sir.
> [discussion of overhead projector omitted]
> Q.   This is 447 that we just talked about, Exhibit 447?
> A.   Correct.
> Q.   I have highlighted on the accounts receivable trade and
>       inventory, correct?
> A.   Correct.
> Q.   I have highlighted the date?
> A.   Yes, sir.
> Q.   Mr. Monsour, can you go to Exhibit 412, which was admitted
>       yesterday during your testimony?
> A.   Yes, sir.
> Q.   Mr. Monsour, I'm going to show you my copy of that exhibit.
>       I have highlighted the date and the accounts receivable, trade.
>       I have highlighted the inventory balance and frankly I have
>       highlighted current liabilities, notes, payables.
> A.   Yes, sir.
> Q.   That's actually highlighted on your exhibit, isn't it?

-3-

A. Yes, sir.

Q. Is that on 412?

A. Uh-huh.

Q. Mr. Monsour, Exhibit 412 was admitted yesterday. Exhibit 12 is a balance sheet, correct?

A. Yes, sir.

Q. And it's a balance sheet of 12-29-2001?

A. Yes, sir.

Q. And that's the same date as Exhibit 447?

A. Correct.

Q. But yesterday—I'm sorry. And that exhibit shows an account receivable trade of $1,073,575.46?

A. Yes, sir.

Q. Shows an inventory of $1,643,819.80?

A. Yes, sir.

Q. I placed that on the [projector]. It won't work that way. But exhibit 447 shows an accounts receivable trade of $894,841.36, and Exhibit 412 show $1,073,575.46. Yesterday you testified that Exhibit 412 was inaccurate. Is that your testimony today?

A. Yes, sir.

Q. Okay. So that number is the one million 73 thousand and change is an inaccurate number?

A. Yes, sir.

Q. And the inventory on that document shows $1,643,819.80 as opposed to 447, which shows $997,950, right?

A. Yes, sir.

Q. And that number is inaccurate, correct?

A. Yes, sir.

*Id.* at 212–15. Then counsel unsuccessfully attempted to question Mr. Monsour about the reason for the discrepancy in the figures:

Q. Mr. Monsour, I don't understand why the numbers are inaccurate. Can you tell me why?

A. I believe Judge Marten instructed me to not talk about that.

Attorney for [MMF]: Your Honor, may we please have a bench conference?

The Court: Certainly

(Off the record bench conference.)

Q. [Attorney for MMF]  Mr. Monsour, I'm exhibiting Exhibit 412 on the [projector].  I'm putting the top part of it.  I'll tell you that post-it notes appear that I put there.  Mr. Monsour, tell us, if you can, who prepared this balance sheet as of 12-29-2001?

A. Shelly Corn.

Q. Okay.  Was it prepared at your instruction?

A. Most likely.

Q. Best of your recollection it was?

A. Yes.

Q. There's a discrepancy between Exhibits 412.  There are two, actually, between 412 and 447.  First discrepancy is in accounts receivable.  447 says there was 894,841.36 accounts receivable and Exhibit 412 shows a 1,073,576.46.  How [d]o you account for that discrepancy?

A. The larger one is inaccurate.

Q. To which you have testified before, but how do you an [sic] account for that discrepancy?

A. The numbers are inflated.

Q. Let me direct your attention to 447 and 412, inventory valuation.  Number on 47 is 997,950 even.  Inventory on 412 is 1,643,819.  There's a discrepancy between those two documents on inventory valuations.  How do you account for that?

A. Larger numbers are inaccurate.

Q. Yes, sir.  They are thank you.  How do you account for the inaccuracy?

A. The larger numbers are inflated.

Q. At your direction?  The inflation of the numbers?

A. I think I have been directed by Judge Marten to not talk about that.
          The Court:  I think you have taken it about as far as you
               can go.

*Id.* at 215–16.

The majority opinion states that "Mr. Monsour essentially testified that the misstatements were intentional and that he had been dishonest."  Op. at 7.  But I cannot agree with that characterization.  He admitted that there were

-5-

misstatements, that the figures were inflated, and that the balance sheet "was prepared at [his] instruction." But he did not admit that he (or anyone else) intended the figures to be incorrect or even that he knew the figures to be incorrect when the balance sheet was prepared. A jury would have to speculate to infer from this testimony that Mr. Monsour had engaged in any misconduct that would damage his credibility.

Compare that cross-examination testimony to Mr. Monsour's testimony at his deposition. The first part of the deposition testimony resembles what was presented at trial:

> Q. Just take a look at 9 and 9A. [Deposition Exhibit 9 became Trial Exhibit 412 and Deposition Exhibit 9A became Trial Exhibit 447]. When I review those documents, in the entry "Accounts Receivable - trade (net)," do you see that entry?
> A. Both documents. Correct.
> Q. And 9 reflects "Accounts Receivable - trade (net) value of $1,090,500," and 9A reflects "$765,071"; they are of like date. I don't understand the difference; can you explain it to me?
> A. I will have to review them, but I will try to explain it.
>      [Counsel for Monsour's]: Take your time.

*Id.*, Vol. 2 at 376.

But then counsel elicited Mr. Monsour's involvement and motive, two critical facts not presented to the jury:

> Q. [By Counsel for MMF]: And I just want you to explain that entry to me.
> A. Which entry is that?
> Q. The "Accounts Receivable - Trade (net)."
> A. Could be one of two things. One, sometimes from Shelly's cutoff to when she actually brings them up-to-date, those

-6-

> numbers can change. Or two, I could have told her to raise
> those numbers.
>
> Q. Why would you do that?
> A. To make the balance sheet look better.
> Q. Why would you do that?
> A. For bank purposes.
> Q. Why would you do that? I don't understand.
> A. To stop a loan from being called.
> Q. Are you familiar with the term "dishonest"?
> A. Yes, sir.
> Q. *Don't you think that is just downright dishonest*?
> A. *What it is is a man trying to keep his business going*.
> Q. I understand that. And therefore, *would I be correct in understanding that you were willing to do anything that you could do to keep your business afloat, including provide false information to lending institutions; isn't that true*?
> A. *That is true*.
> Q. All right. Good. Let's look at the inventory amount. I will tell you that Exhibit 9 shows an inventory of $1,643,820, and Exhibit 9A shows $997,950; can you account for the difference in that?
> A. That would have been artificial inflation on my part.
> Q. Sir?
> A. *I would have told Shelly Corn to raise that number*.
> Q. *For the same reason that you gave me for artificially inflating accounts receivable trade net*?
> A. *Yes, sir*.

*Id.* (emphases added). Had MMF been permitted to pursue this cross-examination

at trial, the jury could have drawn a rather different picture of Mr. Monsour's

credibility.

The district court's expressed reasons for excluding the cross-examination

are unsupportable. Before Mr. Monsour testified, the court granted Monsour's

motion in limine to exclude the evidence "because it is irrelevant." *Id.* at 423. I

do not understand, however, how evidence so clearly probative of a lack of

-7-

veracity could be irrelevant. Then, after the above-quoted cross-examination, when MMF's counsel again requested an opportunity to question Mr. Monsour on the matter, the court said: "I'm going to keep it out. The reason is the 403 [sic]. I think that the danger of unfair prejudice substantially outweighs any probative value; that getting into the reasons for the inflated balance sheet would provide to the jury." *Id.*, Vol. 4 at 283. With all due deference (and we owe the trial judge great deference), I cannot follow this explanation. If the concern is that the jury might think that Exhibit 412 was given to MMF, I would think that the jury need only be informed (as Mr. Monsour testified on direct examination) that it had not been. Jurors are not idiots. Or if the concern is that the jury might infer that some other inventory numbers given to MMF were false, that is not a legitimate concern. A jury should not be precluded from inferring that a witness who would lie on one occasion for business reasons would lie on other occasions. And if the concern is that too much court time would be expended by Mr. Monsour in explaining his justification for lying to banks, then perhaps trial judges should always exclude impeachment evidence on the ground that the witness will need too much time to rationalize lying. MMF was not seeking to take the court's time by inquiring into alleged errors in numerous reports. Indeed, it was not seeking to question Mr. Monsour on any additional documents. It simply wished to elicit that Mr. Monsour had intentionally falsified the document about which he had been cross-examined and that he did it to save his business. That would have

-8-

been devastating impeachment; nothing else in the cross-examination came close to having such an effect.

In short, the restriction on the cross-examination of Mr. Monsour was clear error. And the error requires reversal of the verdict.

I have no substantial disagreement with the majority opinion's analysis of the other issues on appeal. But that analysis would be mooted by requiring a new trial at which MMF could conduct a proper cross-examination of Mr. Monsour.